UNITED STATES SMELTING REFIN-
ING AND MINING COMPANY,
Plaintiff,

v.

AETNA CASUALTY AND SURETY
COMPANY, Defendant.

No. 70 Civ. 5017.

United States District Court,
S. D. New York.

March 26, 1974.

Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff; Robert W. Sweet, William P. Frank, Stanley A. Teitler, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant; Alfred J. Morgan, Jr., William P. Sullivan, Jr., New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

This is an action by an insured against its insurer to recover for the loss of more than six tons of gold and silver valued at $394,096.52. In the first cause of action of the amended complaint plaintiff United States Smelting Refining and Mining Company (now U.V. Industries, Inc.), seeks to recover $394,096.52, the claimed value of the gold and silver allegedly stolen by dishonest employees. Alternatively, in the second cause of action, plaintiff seeks to recover $300,000 (the policy limit) alleging that if the gold and silver was not stolen by dishonest employees, it disappeared.

Plaintiff is a corporation organized under the laws of Maine, with its princi-pal office in the Southern District of New York. Defendant is a stock company organized under the laws of Connecticut, with a place of business in this district. The jurisdiction of this Court is based on diversity of citizenship, 28 U.S.C. § 1332.

On or about October 28, 1964, defendant issued to plaintiff a policy of insurance entitled "Blanket Crime Policy" effective November 8, 1964 *. The policy limit was $300,000.

By the terms of Insuring Agreement I of the policy defendant agreed to cover plaintiff against:

"Loss of Money, Securities and other property which the Insured shall sustain . . . through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others."

The policy does not apply:

"under Insuring Agreement I, to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of Money, Securities or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees;" (Section 2(b)).

The policy further provides:

"If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Insured shall be unable to designate the specific Employee or Employees causing such loss, the Insured shall nevertheless have the benefit of Insuring Agreement I, subject to the provisions of Section 2(b) of this Policy, provided that the evidence submitted reasonably proves that the loss

---

* The policy also covered plaintiff's subsidiaries.

was in fact due to the fraud or dishonesty of one or more of the said Employees, and provided, further, that the aggregate liability of the Company for any such loss shall not exceed the Limit of Liability applicable to Insuring Agreement I." (Section 4).

Under Insuring Agreement II of the policy defendant agreed to cover plaintiff against:

"Loss of Money and Securities by the actual destruction, disappearance or wrongful abstraction thereof within the Premises. . . ."

"Money" is defined in the policy as "currency, coins, bank notes and *bullion*; and travelers checks, register checks and money orders held for sale to the public." (Section 3). (Emphasis added)

On or about November 19, 1965 defendant also issued to plaintiff a policy of insurance known as a "Comprehensive Dishonesty, Disappearance and Destruction Policy" effective November 8, 1965 which covered plaintiff for loss of money, securities or other property sustained through any fraudulent or dishonest act or acts committed by any employees acting alone or in collusion with others. This policy was in the penal sum of $200,000 excess of $300,000. In all relevant respects the language of this excess policy is identical to the language of the "Blanket Crime Policy."

By reason of the two policies and subject to the various conditions and limitations contained therein plaintiff and its subsidiaries had a total of $500,000 in coverage for losses sustained through employee dishonesty and $300,000 in coverage for loss of money and securities by the actual destruction, disappearance or wrongful abstraction thereof from plaintiff's premises.

On October 24, 1969 plaintiff filed with defendant a proof of loss wherein plaintiff claimed a loss of gold and silver having an aggregate value of $394,096.52 "due to the dishonesty of Henry Jones, Willie Reed, George Kasperski, James Smith and other employees; also non-employees . . . ."

Defendant argues that this proof of loss was not timely and was not adequate to cover a claim under Insuring Agreement II based on the disappearance of bullion. The provisions of the insurance policies that plaintiff had to give notice of loss "as soon as practicable" mandate notice within a reasonable time in light of all the circumstances. Rand v. Underwriters at Lloyd's, London Subscribing Lloyd's Policy No. DB 6/234, 295 F.2d 342 (2d Cir. 1961); Zauderer v. Continental Casualty Co., 140 F.2d 211 (2d Cir. 1944).

The first actual knowledge which plaintiff or its subsidiary U.S. Lead Refinery, Inc. ("Lead") had of the loss of gold and silver was acquired following completion of Lead's annual inventory in December, 1968. Plaintiff notified defendant of the loss prior to January 27, 1969. Any suspicions which officers of Lead had earlier were not sufficient to require an earlier notification to defendant. United States Fidelity and Guaranty Company v. Empire State Bank, 448 F.2d 360 (8th Cir. 1971). Defendant granted plaintiff several extensions of time within which to file its formal proof of loss. The proof of loss was filed on October 24, 1969, before the expiration of the last extension granted by defendant; and this action was commenced November 3, 1970, within two years of the discovery of the loss. Thus, both the filing of the proof of loss and the commencement of this action were timely.

Defendant further contends that the proof of loss wherein it was alleged that Lead had sustained a loss in the sum of $394,096.52 "due to the dishonesty of Henry Jones, Willie Reed, George Kasperski, James Smith and other employees; also non-employees" was not adequate to inform defendant that plaintiff intended to make a claim under the "disappearance" provision of the policy. The Court finds that the proof of loss with supporting papers adequately notified defendant of the factual basis of

plaintiff's claim, the loss of more than six tons of gold and silver.

To understand the nature of the plaintiff's claim, it is necessary to examine plaintiff's operations during 1967–1968. During 1967–1968 plaintiff mined lead ore in Lark, Utah, and sent the ore to its flotation mill in Midvale, Utah, to be refined into lead concentrates. The concentrates were sent from the mill to the smelter of International Smelting Mining and Refining Company ("International"), a subsidiary of Anaconda Mining Company ("Anaconda"), at Tooele, Utah, to be refined into lead bullion. The concentrates and lead bullion were assayed at the International smelter. After being put through the smelter, the molten lead was cast into lead anodes, each weighing approximately 580 pounds, and shipped by rail to a plant operated by Lead in East Chicago, Indiana.

A copy of the bill of lading was mailed to the East Chicago plant prior to the arrival of the anodes. When the anodes arrived at East Chicago the railroad cars were opened and the anodes were unloaded and counted to confirm that the number of anodes listed on the bill of lading conformed to the number of anodes received.

The anodes were then brought inside the casting house and thereafter were taken 28 at a time to the tank house and deposited into cells filled with acid. An electrolytic process separated the lead from the other metals (antimony, gold, silver, bismuth, copper, arsenic, selenium and tellurium). The lead was removed, but the other metals remained on the anodes as a loosely adherent slime layer.

The slime, which still contained some lead, was washed off the anodes and pumped from the tank house into a slime tank in the silver refinery where the acid was removed. The slime then dropped into an agitator tank and was pumped to the rotary drum filter which took out some of the moisture and formed a "slime cake". The wet slime cake was taken by screw conveyor to the wedge roaster which eliminated the remaining moisture and produced a calcine.

The calcine was carried by screw conveyor to 2 storage bins directly above 2 calcine furnaces and dropped into the furnaces. As the calcine was oxidized, gold, silver, tellurium and sometimes selenium separated and sank to the bottom. The remaining metals were removed from the furnaces in the form of calcine and end caustic slag. The gold, silver, tellurium and sometimes selenium were transferred in a molten state to the adjacent dore' furnace. The molten metal remained in the dore' furnace for approximately 4 days during which time chemicals were added to take out the tellurium and other impurities. The remaining metal, primarily gold and silver, and small amounts of tellurium and sometimes selenium, when it had been refined to the degree of purity required by a contract between plaintiff and Anaconda, is called dore'.

The molten dore' was cast into molds which when cooled formed bars. Each bar was 8 inches wide, 18 inches long, one half inch thick and weighed approximately 25 pounds. The casting of the dore' was done under strict supervision. The bars were counted by two persons (one being the silver refining foreman or his assistant), weighed, banded together and immediately placed in a vault. Within a maximum time of two or three days, the dore' bars were removed from the vault, recounted, strapped and taken by truck to Anaconda's plant in Perth Amboy, New Jersey, where the silver was separated from the gold.

Plaintiff's witness, Frank C. Smyers, who was plant manager at the East Chicago plant in 1967–1968 testified in substance that gold is indestructible; that very little silver can be vaporized; and that there is no way in which 175,117.90 Troy ounces of silver and 1,037.945 Troy

ounces of gold, the quantity involved, could be decomposed during the refining process.

Plaintiff was able to account for each bar of dore' which was cast in 1967–1968. Hence, there was no loss of dore' in bar form.

Plaintiff also presented circumstantial evidence showing the established rate of recovery of gold and silver and detailed inventory records proving the existence and extent of its loss. Over the course of many years of production experience, plaintiff has established the normal percentage of recovery of precious metals contained in the lead bullion received from Utah. This norm was 98.5% for silver and 100% for gold. The expected losses were included in the inventories as a normal write-off. The inventory covering the period at issue here, September 1, 1967 to September 1, 1968, commenced in September, 1968, and was completed in early December, 1968. It showed a loss in silver of 23% and a loss in gold of 46.2%. At the same time, the inventory indicated that the loss factors for the other metals remained consistent with previous years.

As noted above, plaintiff also introduced unrebutted evidence that there is nothing inherent in the metallurgical composition of the elements of lead bullion treated at Lead which could allow for decomposition of the gold and silver while in the refining process. Additionally, plaintiff made an unrebutted showing that the refining process at Lead precludes loss of precious metals by accidental or negligent mishandling; because once the lead bullion enters the closed circuit refining process, built-in mechanisms insure that no precious metals are lost as waste products.

The Court finds that there was a loss of gold and silver which could have occurred only after the lead bullion was received at the East Chicago plant and prior to the time when the dore' was cast into bars.

At trial, the only direct evidence of employee dishonesty involved one Henry Jones. On August 16, 1968 Jones, an employee at the East Chicago plant, was found to have one bar of silver in his possession. Jones always maintained that he was innocent but, nevertheless, was arrested, tried and found guilty. After the trial the police returned the silver bar to Lead; thus, plaintiff sustained no loss by reason of this incident.

Jones, who was discharged at the time of his arrest, was the only employee found in wrongful possession of silver or gold during the time in which plaintiff claims that 12,000 pounds were stolen by employees. He was the only employee discharged for the theft of gold or silver during said period.

In addition to the aforementioned direct evidence of employee dishonesty, plaintiff presented certain circumstantial evidence. James Howell, who has been employed by Lead as a furnaceman from 1963 to the present, testified that he found several hot bismuth molds near the dore' furnace on five to seven occasions; that there was no dore' in the molds when he came upon them (although on one occasion the molds were hot); that on each occasion that he found molds he also found dore' caked on the handle of his sampling ladle; that at one time he came upon Henry Jones chipping cold dore' out of the furnace; that when Howell called to Jones the latter left the area without any dore' in his possession; that on two occasions he accompanied a night foreman to locations where the foreman had discovered pigs of dore' metal hidden and returned them to the furnaces; that on one occasion he saw a bar of dore' on the ground in the parking area and when he returned on the following day the bar was not in the same place. However, he never saw any employee leave the plant with dore' in his possession. On cross-examination Howell was unable to state with any reasonable degree of certainty the dates of any of the aforementioned occurrences. He testified that some of the incidents occurred in the Spring of 1967, i. e., prior to September 1, 1967 the date on which the claim period com-

menced. He had no idea of the dates on which he found the molds by the dore' furnace. His testimony was so indefinite that it can be accorded little weight in determining whether or not the incidents occurred during the time in which plaintiff claims its loss occurred.

Section 2(b) of the policies mandates proof wholly independent of inventory computations to support a claim under Insuring Agreement I which covers employee dishonesty. Although plaintiff presented some evidence other than inventory computations to prove employee dishonesty, the Court is not persuaded that plaintiff has made a *prima facie* case as to the existence of any loss other than through the inventory computations. Dunlop Tire & Rubber Corp. v. Fidelity & Deposit Co. of Md., 479 F.2d 1243, 1247 (2d Cir. 1973); Kernwood Mfg. Corp. v. Home Indemnity Co., 65 Misc.2d 354, 317 N.Y.S.2d 113 (N.Y. Civ.Ct.1970), aff'd, 67 Misc.2d 888, 326 N.Y.S.2d 682 (App.Term, 1st Dep't 1971). Thus, the Court need not choose between that line of cases requiring independent evidence as to both the existence and amount of loss and the conflicting line of cases allowing the introduction of such computations as the only proof as to the extent of loss, where there is some independent proof of employee dishonesty. *See Dunlop, supra,* n. 5 at 1246–1247.

■ Section 4 of the policies imposes a requirement in addition to Section 2(b) (the inventory exclusion). Where the insured claims that a loss was caused by employee dishonesty, but the dishonest employees cannot be identified, the insured must submit evidence which "reasonably proves" that the loss was caused by the fraud or dishonesty of undesignated employees. Therefore, before inventory computations will be admitted as evidence in the insured's case in chief, it must be reasonably proven that a loss caused by employee dishonesty has been sustained. This requires more than "some independent evidence" but less than a *prima facie* case as a condition to the use of inventory computations. Dunlop Tire & Rubber Corp. v. Fidelity & Deposit Co. of Md., *supra.* In the instant case there was no "reasonable proof" that plaintiff sustained a loss by employee dishonesty.

Plaintiff, therefore, has not made out a *prima facie* case in support of its first cause of action which is accordingly dismissed.

■ In the second cause of action of the amended complaint, plaintiff claims that gold and silver bullion disappeared from its premises and that this disappearance is within the coverage of Insuring Agreement II which insures plaintiff and its subsidiaries in an amount up to $300,000 for all loss of money, which is defined in the policy to include bullion, and securities as a result of the "actual destruction, disappearance or wrongful abstraction thereof within the Premises" occupied by plaintiff or its subsidiaries.

Clearly, this clause does not cover plaintiff for the loss of any and all property, but only against loss of "Money and Securities" as defined in the policy, from plaintiff's premises.

At trial it was established by inventory records which the Court finds accurately reflected the quantity of gold and silver received by plaintiff and the quantity which it ultimately recovered, that there was a loss and that it most probably occurred during the final refining stage inasmuch as a loss of such a substantial quantity of gold and silver could not have occurred at an earlier stage without corresponding losses of other metals.

The only other explanation for the loss is that it was the result of an incorrect assay or weighing and extension of those figures in determining the metal content of the metals treated for plaintiff by International at Tooele, Utah. The Court funds this explanation unpersuasive. International and plaintiff, pursuant to written agreement, each assayed samples of plaintiff's input of lead concentrates and samples from the output from International's smelter. In

each instance, the final adopted figure was the average of the two assays, provided the assays were within narrow splitting limits provided for in the contract. During 1967 and 1968, there were no disputes between the parties regarding the assays.

The records of Lead for the period 1967–68 indicate that it received 991,749.13 ounces of silver and 2713.633 ounces of gold which was contained in the lead bullion anodes which had been refined by International at Tooele. The accuracy of these records is supported by the fact that these figures (number of anodes, assays and contents by metal percentage) were mutually agreed upon by International and plaintiff pursuant to an arms length business transaction.

Also supportive of the accuracy of Lead's records of receipt of lead bullion and the silver and gold contained therein, is the fact that Lead's supplier of lead bullion (plaintiff's Utah operation) maintained its own records. If the figures reflecting Lead's receipt of silver and gold were overstated as a result of two incorrect assays, agreed upon by both International and plaintiff, a book loss to Lead would have resulted. However, an unaccounted for gain would necessarily have resulted to plaintiff's Utah operation. Plaintiff demonstrated that its Utah operation experienced no corresponding unexplained gain to account for the loss of 6 tons of silver and gold at the East Chicago plant.

As noted above, there is nothing inherent in the metallurgical composition of the elements of lead bullion treated at Lead which could allow for decomposition of the metals while in the refining process. Additionally, the refining process at Lead precludes loss of precious metals by accidental or negligent mishandling. This is true because once the lead bullion enters the closed-circuit process, built in mechanisms insure that no precious metals are lost as waste products.

The substance, which in the final stage is known as dore', is a combination of silver and gold mixed with small amounts of tellurium and sometimes selenium. Since it is incredible that the quantity of gold and silver which was missing could have been chipped out of the furnace while the furnace was frozen, the missing gold and silver could only have been taken from the furnace while the metal was in a molten state. However, it is most unlikely that the metal could have been removed from plaintiff's premises while in a molten state. Rather, it could only have been removed after it was cooled and became a solid. The Court, therefore, is not called upon to decide if molten dore' constitutes bullion within the meaning of Insuring Agreement II.

Since "bullion" is not defined in the policy, the Court must determine what was intended by the parties. In the absence of other evidence the Court can only be guided by the definition of "bullion" in the metals industry and by its common meaning.

The Metals Handbook (8th ed. 1961) published by the American Society for Metals includes the following in its definition of "bullion":

"bullion. (1) A semirefined alloy containing sufficient precious metal to make recovery profitable. (2) Refined gold or silver, uncoined."

"Bullion" is defined in the Dictionary of Mining Minerals and Related Terms (United States Department of Interior, Bureau of Mines (1967)) as "uncoined gold or silver in the shape of bars or ingots or comparable masses; semirefined alloy containing sufficient precious metals to make recovery profitable.

Webster defines bullion as "1a: gold or silver considered merely as so much metal without regard to any value imparted to it by its form < the ~ contained in a silver dollar >; specif: uncoined gold or silver in the shape of bars, ingots, or comparable masses b: metal in the mass < lead ~ >." Webster's Third New International Dictionary (unabridged) (1963). The word is

probably derived from the Middle French word bouiller or boiler meaning to boil. *Id. See also*, Random House Dictionary of the English Language (unabridged) (1966); The Shorter Oxford English Dictionary (3d ed. 1955); 4 Encyclopaedia Britannica 373–74 (1959).

Black's Law Dictionary (Revised 4th Ed. 1968) the following definition:

"Gold and silver intended to be coined.

"The term is usually applied to a quantity of these metals ready for the mint, but as yet lying in bars, plates, lumps, or other masses; . . ."

It is, thus, apparent that "bullion" at the very least encompasses any solid mass of uncoined gold or silver whatever its shape so long as its shape does not enhance its value. *See*, Jarrell-Ash Co. v. United States, 278 F.Supp. 658 (Customs Ct., 2d Div.1968). As noted above, at the time of its removal from plaintiff's premises, the dore' had to have been in solid form. Therefore, it comes within the meaning of "bullion" as used in Insuring Agreement II.

■ It is undisputed that Insuring Agreement II makes "disappearance" a separately covered risk from "theft". 5 Appleman's Insurance Law & Practice § 3173.25; Sprau v. State Farm Fire and Casualty Company, 308 F.Supp. 549 (D. Mont.1970); Seward v. Assurance Co. of America, 218 Cal.App.2d 895, 32 Cal. Rptr. 821 (Super.Ct., Alameda Co. 1963); Englehart v. Assurance Co. of America, 139 So.2d 108 (La.App.1961); and also that the insured need not establish that the loss probably resulted from theft. 5 Appleman's Insurance Law & Practice § 3173.25; Seward v. Assurance Co. of America, *supra*; Englehart v. Assurance Co. of America, *supra*; Hammontree v. Central Mut. Ins. Co., 385 S.W.2d 661 (Mo.1965); Raff v.

Farm Bureau Insurance Co. of Nebraska, 181 Neb. 444, 149 N.W.2d 52 (1967).

The evidence shows that the gold and silver was lost under unknown, puzzling and baffling circumstances and under circumstances difficult to explain. 5 Appleman's Insurance Law & Practice § 3173.25; Seward v. Assurance Co. of America, *supra*; Englehart v. Assurance Co. of America, *supra*; Hammontree v. Central Mut. Ins. Co., *supra*; Raff v. Farm Bureau Insurance Co. of Nebraska, *supra*; Davis v. St. Paul Mercury & Indemnity Co., 227 N.C. 80, 40 S.E.2d 609 (1946).

Defendant contends that plaintiff's only proof of the existence and subsequent disappearance of the gold and silver consists of inventory records which defendant argues are insufficient to prove a covered disappearance. The Court disagrees. Section 2(b) of the policy's "Conditions and Limitations" dealing with the limited admissibility of inventory records is restricted to recovery under Insuring Agreement I (Employee Dishonesty) and has no application to Insuring Agreement II (Loss Inside the Premises). If defendant had intended to require proof independent of inventory records to establish a "disappearance," Section 2(b) could have been made applicable to Insuring Agreement II as well.

The Court, therefore, concludes that plaintiff has proven the disappearance within the coverage of Insuring Agreement II of 175,117.90 Troy ounces of silver and of 1,037.945 Troy ounces of gold valued at $394,096.52. Accordingly, plaintiff is entitled to judgment in the amount of $300,000, the limit of Insuring Agreement II.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed. R.Civ.P.

Settle judgment on notice.