IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 10, 2004 Session

# HCA, INC. v. AMERICAN PROTECTION INSURANCE COMPANY & INDUSTRIAL RISK INSURERS, ET AL.

Appeal from the Chancery Court for Davidson County
No. 01-1773-III     Ellen Hobbs Lyle, Chancellor

No. M2003-02065-COA-R3-CV - **Filed January 24, 2005**

HCA, Inc. appeals the action of the trial court in granting summary judgment to the insurer/ defendants based upon an "inventory exclusion" provision in the policies of insurance. We reverse the action of the trial court and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. WILLIAM C. KOCH, JR., P.J., M.S., filed a concurring opinion.

H. Lee Barfield, L. Wearen Hughes and Tara L. Swafford, Nashville, Tennessee, for the appellant, HCA, Inc.

Michael G. Zanic, Peter N. Flocos, Pittsburgh, Pennsylvania, Of Counsel.

Rebecca Levy-Sachs, Sarasota, Florida, and Andrée Sophia Blumstein, Nashville, Tennessee, for the appellees, American Protection Insurance Company and Industrial Risk Insurers, et al.

Patricia Head Moskal, Nashville, Tennessee, and Anthony J. Russo, Tampa, Florida, for the appellee, Winterthur.

**OPINION**

## I.  The Parties - the Insurance Policies and the Language of the Inventory Exclusion Clause

Plaintiff HCA, Inc. is the parent company of a number of subsidiaries and other affiliates that operate over 200 proprietary hospitals and a variety of other health care facilities throughout the United States. The claims which are involved in this appeal arise from the daily operation of 105 of these hospitals and 20 other surgical facilities.

Defendants are American Protection Insurance Company ("Kemper"), and various insurance companies which may be divided into two groups. First are the Winterthur defendants collectively consisting of Winterthur International America Insurance Company (now known as XL Insurance

Global Risk), Lexington Insurance Company, RLI Insurance Corporation, General Star Indemnity Company, Commonwealth Insurance Company, Continental Insurance Company, Sirius Insurance Corporation, Zurich Reinsurance Company, Royal Indemnity Company, and Employer's Insurance of Wausau. The second group of insurers, (collectively the "IRI defendants") are Allianz Insurance Company, The Travelers Indemnity Company of Illinois, certain underwriters of Lloyds, London, and IRI.

The policies of insurance in issue are what is known in the industry as "all-risk" policies. All of the policies contained deductible clauses providing: "All losses, damages, or expenses arising out of any one occurrence shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted the sum of U.S. $250,000."

Each of the policies also contained an "inventory exclusion" clause providing:

> This Policy does not insure against:
> A.  Loss or damage caused by infidelity or dishonesty of the Insured; embezzlement of the Insured's property by any of the Insured's employees; nor loss or damage resulting from the Insured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense; nor any unexplained loss, mysterious disappearance, or loss or shortage disclosed on taking inventory, except this exclusion does not prohibit proving the amount of any loss otherwise provable by inventory;

In describing an all-risk policy the trial court stated:

> Unlike typical property loss policies which are structured to cover specified losses for which the parties contract, an all-risk policy automatically covers any loss unless the policy contains a provision expressly excluding the loss from coverage. As explained by Couch in his insurance treatise, "In recent years, so-called 'all-risk' insurance policies have been used with increasing frequency. An 'all-risk' policy creates coverage of a type not ordinarily present under other types of insurance, and recovery is allowed for fortuitous losses unless the loss is excluded by a specific policy provision. . . ." *Couch on Insurance* 3d § 147:50 (3d ed. 1998).
> The effect of an all-risk policy is to broaden coverage. A policy of insurance insuring against all risks creates a special type of insurance "extending to risks not usually contemplated, and recovery under the policy will be generally allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured unless the polic[y] contains a specific provision expressly excluding the loss from coverage. *Lyons Diecasting Co. v. NEC, Inc.*, 1990 WL 51809, at \*5 (Tenn.Ct.App. April 27, 1990). Under an all-risks policy the plaintiff need only prove that a fortuitous event caused the loss. *Persian Galleries, Inc. v. Transcontinental Insurance Co.*, 38 F.3d 253, 257 (6th Cir. 1994). A fortuitous event is "an event which so far as the parties to the contract are aware, is dependant upon chance." *Persian Galleries*, 38 F.3d at 257. A fortuitous event may be beyond the power of any human to bring the event to pass or it may be within the control of

third persons or even be a past event provided the fact is unknown to the parties. *Id.* It is not necessary for the plaintiff to show how the property came to be lost or the methods or means by which the property came to be lost. It is sufficient if the plaintiff shows the property is lost and covered by the physical loss provision of the contract of insurance. *Id.*

Since we cannot improve on this statement by the chancellor we adopt it.

At the outset we must acknowledge and applaud the skill and industry of all counsel in this case. The briefs and the appendices to briefs filed in this court are in the highest tradition of superlative appellate practice. No effort, however laborious and tedious, has been spared by counsel in deep and comprehensive analysis of this complex case and in exposition of applicable case law. This court is much appreciative of such efforts.

## II. The History of the Case

In the day-to-day operation of its 105 separate hospitals and 20 surgical centers, HCA uses massive quantities of linens including bed sheets, pillow slips, and surgical gowns. Laundering, maintenance, and constant supply to the various facilities is a major undertaking. On January 22, 1996, HCA entered into a contract with FDR Services Corporation whereby FDR agreed to provide services including but not limited to laundering of linens, supplying of linens to various HCA medical facilities, and management of the linen inventory, including the ordering of additional linen as needed. FDR operated pursuant to this contract from January 22, 1996 until May 1, 1998 when the contract was assigned by FDR to Tartan Textiles, Inc. In September of 1998, HCA conducted a physical inventory of linen stocks in its surgical and medical facilities. Thereafter HCA determined that during the period of its contractual relations with FDR it had suffered a loss of linen stock at a value of somewhere between eight and twelve million dollars which it determined to result from mismanagement of inventory by FDR and other acts of misfeasance and malfeasance on the part of FDR.

Following the September 1998 inventory HCA demanded payment of its losses under the various "all-risk" policies issued by the defendant insurance companies. All of the insurance companies declined to pay the alleged loss, and HCA filed suit.

## III. Issues Drawn by the Pleadings

By its third amended complaint, HCA asserts claims against all of the insurance company defendants for breach of contract in that they failed to pay for losses allegedly occurring between January 22, 1996 and May 1, 1998, for the value of linens "either lost or stolen while in the possession or care of FDR" which were no longer physically available to HCA. HCA alleged the loss, notice to the insurers, proper proof of loss, demand for payment, and refusal of the insurers to pay. The complaint further sought relief under the Tennessee Uniform Declaratory Judgments Act. *See* Tenn. Code Ann. §§ 29-14-01, et seq. Plaintiff demanded a jury of twelve to try the case and sought declaratory judgment adjudging the rights and obligations of the parties, a judgment against the insurers together with prejudgment interest, attorney's fees, costs, expenses and post-judgment interest.

The defendants answered the complaint admitting the issuance of their various policies but denying that the policies were in effect at the time of the alleged losses. The defendants denied that a single loss had occurred but asserted instead that if losses had occurred they were plural losses resulting from separate "occurrences." The companies generally denied liability and that either a loss or losses had occurred within the meaning of their various policies.

Defendants asserted twenty separate affirmative defenses, six of which are relevant to the issues on appeal:

### Third Affirmative Defense

62. <u>Loss or shortage disclosed on taking inventory</u>. The policies exclude from coverage losses caused by certain perils. One such exclusion is loss or shortage disclosed on taking inventory. A shortage of linen was disclosed when HCA conducted a system-wide inventory of its linen in September 1998. The alleged losses associated with this shortage disclosed on taking an inventory, and are therefore excluded.

### Fourth Affirmative Defense

63. <u>Unexplained loss or mysterious disappearance</u>. The policies exclude from coverage losses caused by certain perils. One such exclusion is for "any unexplained loss, mysterious disappearance." HCA, Inc. is unable to explain how the linen in its asserted "linen loss claim" came to be lost when any of this linen was allegedly lost, or the cause of any of this asserted loss. The losses are therefore "unexplained," and constitute a "mysterious disappearance" as those terms are used in the law. Therefore, the asserted "linen loss claim" is excluded by the IRI policies.

### Fifth Affirmative Defense

64. <u>Loss by fraudulent scheme, etc.</u> The policies exclude from coverage loss or damage caused by or resulting from the insured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense. HCA has, or appears to have, asserted in this or other lawsuits, that the linen in the "lost linen claim" was converted by FDR as part of a fraudulent "ragout" scheme whereby FDR was permitted to take possession and title to HCA's linen and sell those linens for salvage value. All alleged "losses" would thereby result from HCA having voluntarily parted with title or possession to these linens by fraudulent scheme, trick, device or false pretense, and therefore the "losses" would be excluded.

### Sixth Affirmative Defense

65. The policies do not insure against losses caused by normal wear and tear. Linens are a rapidly depreciating commodity. They wear out, and they are pilfered from the individual facilities. These two categories of usage constitute normal wear and tear and the entire "linen loss claim" is nothing more than normal wear and tear for HCA's business operations.

* * *

**Twelfth Affirmative Defense**

71.     The policies contain a deductible in the amount of $250,000 per occurrence.  This deductible applies to HCA's "linen loss claim."   Application of the deductible to each occurrence precludes any recovery because the value of any single occurrence does not exceed this deductible.

**Thirteenth Affirmative Defense**

72.     The policies contain a deductible in the amount of $250,000 per occurrence.  This deductible applies to HCA's "linen loss claim."  HCA sustained multiple occurrences of "loss" each subject to a separate application of this deductible.  Individual HCA facilities assigned their individual claims to HCA Inc.  HCA Inc. has no independent insurance claim.  HCA Inc. cannot aggregate these assigned claims to defeat application of the proper deductible.

**Fourteenth Affirmative Defense.**

73.     The policies contain a deductible in the amount of $250,000 per occurrence.  This deductible applies to HCA's "linen loss claim."  To the extent that the law requires aggregation of the "losses," the aggregation must be based on at least the number of assignor facilities.  Application of the deductible in this manner precludes any recovery because no individual occurrence or single facility's total loss exceeds this deductible amount.

The pleadings of the parties are extensive and exhaustive as would be expected in a case involving multiple parties and insurance policies which are not exactly alike but all of which generally say the same thing.  This opinion addresses only those issues drawn by the pleadings directly involved in the summary judgment aspect of the case.[1]

## IV.  The Action of the Trial Court

Discovery in this case was extensive, after which Defendants filed motions for summary judgment asserting:  (1) that the plaintiff's claims are barred by the $250,000 occurrence/deductible provisions of the policies; (2)  that the plaintiff's claims are excluded because the alleged loss or shortage was disclosed upon taking inventory, and (3) that the losses alleged occurred prior to the inception of the respective policies and is thus not insured.

As to the "deductible/occurrence" grounds, the trial court held:

---

[1] Issues were drawn in the pleadings between HCA as Plaintiff and American Protective Insurance Company (Kemper) as Defendant.  The trial court granted summary judgment to Kemper on the basis that the losses asserted by Plaintiff did not manifest themselves during the Kemper policy period.  The coverage of the Kemper policy had expired May 1, 1997.  Plaintiff and Kemper had stipulated that prior to May 1, 1997, Plaintiff neither knew nor should have known of any facts that would have led it to believe that it had sustained loss of linens beyond ordinary wear and tear prior to that time.  Plaintiff did not appeal summary judgment for Kemper and that judgment has now become final.

With respect to the motion of Kemper and the Other Defendants[2] for summary judgment that the loss in issue is barred by the deductible/occurrence provision of the policies, the Court denies those motions. In the context of this case, where the facts of loss are somewhat unspecified and all-risk policies are involved, the meaning of the word "occurrence" is not readily ascertainable from the policy. The Court requires additional evidence from the parties concerning the meaning of occurrence in the context of this case to construe that term before the Court can rule on the issue of whether the claim is barred by the deductible/occurrence provision of the contract.

The court then granted the remaining defendants' Motion for Summary Judgment under the inventory exclusion provision observing that such action made it "unnecessary for the court to rule on the Other Defendants' motion for partial summary judgment that the manifestation rule does not change the provision of the policies that linens lost prior to the inception of the policies are not insured."

The trial court then asserted its findings:

A significant aspect of the motions before the Court and opposition to the motions is what HCA knew about the loss and when. In this regard the Court determines that the facts which are established as undisputed on the summary judgment record are as follows. The linens at issue are the personal property of the plaintiff. The linens were in the care, custody and control of FDR from January 22, 1996, through May 1, 1998. Beginning in the third or fourth quarter of 1997 the plaintiff investigated FDR for service deficiencies and cost issues associated with FDR's management of the linen laundering and linen inventory obligations under its contract with the plaintiff. Beginning March of 1999 [sic] the plaintiff implemented budget and inventory controls with FDR. On May 1, 1998, FDR was purchased by [Tartan] Textiles who was assigned the FDR contract. It was agreed by the plaintiff and [Tartan] that a physical inventory would be conducted. The inventory was conducted in September of 1998. Following the September 1998 inventory the plaintiff's Material Management Group estimated that the plaintiff had suffered linen losses of approximately $8.5 million approximately six months prior to the September 1998 inventory. On October 12, 1999, HCA made formal written notice to Kemper of its claims and on September 9, 1999, submitted formal written notice to the Other Defendants of its claims under their policies. In 1999 the plaintiff retained H.G.

---

[2] All of the defendants with the exception of Kemper are referred to in the trial court's "Memorandum and Order" as "Other Defendants."

Busby and Associates to quantify the dollar amount of HCA's insurance claim which the Busby report listed as $12 million.

In ruling on the Other Defendants' Motion for Summary Judgment the trial court held:

On a very different basis, the plaintiff's claim is barred under the Other Defendants' policy.

Item A of perils excluded in the Other Defendants' policy excludes coverage for "loss or shortage disclosed on taking inventory, except this exclusion does not prohibit [proving] the amount of any loss otherwise provable by inventory." Couch on Insurance explains that the reason for the exclusion is that it prohibits coverage where disappearance of property or loss or shortage of property is disclosed on taking inventory. Inventories are not a reliable way to establish a loss. *Couch on Insurance* 3d § 151:43 (3d ed. 1998). As explained in *Strings & Things in Memphis, Inc. v. State Auto Insurance Companies*, 920 S.W.2d 652 (Tenn.App. 1995), an inventory computation does not prove a loss because the loss is arrived at by using an inventory figure which adds purchases to a beginning inventory and subtracts the cost of goods sold. Proof of loss by subtracting an actual inventory from a computed inventory does not satisfy the need for independent evidence of loss. *Popeo v. Liberty Mutual Insurance Co.*, 343 N.E.2d 417, 419 (Mass. 1976). Once there is independent proof of loss, inventory computations are admissible as corroborative evidence. *Popeo*, 343 N.E.2d at 419.

In the case at bar there is no genuine issue of material fact and the summary judgment record establishes that the plaintiff proves the fact of its linen loss by using a comparison of inventories as excluded by the policy. The Court's review of the record causes it to conclude that there is no genuine issue of material fact that the point in time when the plaintiff knew of the alleged loss in issue such that a reasonable insured would be aware that his notification duty under the policy had been triggered was the 1998 inventory. The Court concludes that the inventory is covered by the exclusion of the policy because it began with a projected starting inventory value of linens, added the value of the linen purchases over 33 months, subtracted a "generalized estimate" of what it calls its "expected usage" to determine what "the dollar value of the inventory on hand should be."

The Court, therefore, determines that the plaintiff's claim is excluded from coverage because the loss was disclosed on taking inventory.

Having dismissed the plaintiff's claim against Kemper because the losses did not manifest during the policy period and the claims against the Other Defendants based upon the exclusion of loss disclosed on taking inventory, the Court is left with the motions for summary judgment on the occurrence/deductible provisions of the

-7-

policies. On these defenses the Court denies summary judgment. The meaning of "occurrence" under the facts of this case is not susceptible from the policy. Additional evidence is needed.

Finally, there is the Other Defendants' partial motion for summary judgment that the application of the manifestation rule does not change the provisions of the Other Defendants' policies that linens lost prior to the inception of the policies are not insured. Having granted summary judgment on the loss disclosed on taking inventory exclusion which dismisses the plaintiff's claims against the Other Defendants, it is unnecessary for the Court to rule on the Other Defendants' partial motion for summary judgment.

## V. Summary Judgment Law

In its essential provisions Tenn. R. Civ. P. 56 and Fed. R. Civ. P. 56 are identical. Under such circumstances cases construing the federal rule may be used by Tennessee courts in construing the Tennessee rule. *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *March v. Levine*, 115 S.W.3d 892 (Tenn. Ct. App. 2003); *Gamble v. Hospital Corporation of America*, 676 S.W.2d 340 (Tenn. Ct. App. 1984).

Two competing general rules must be considered. From the myriad of cases available as examples of these two rules, *Charbonnages De France v. Smith*, 597 F.2d 406 (4th Cir. 1979) provides a lucid discussion of the first rule:

> In Chief Judge Parker's oft-cited formulation for this Court, summary judgment "should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950) (reversing grant of summary judgment in contract breach case). It is not appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951). The burden is on the moving party to "show" that there "is no genuine issue as to any material fact" and that he "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.*, 381 F.2d 245, 249 (4th Cir. 1967). In determining whether this showing has been made, we must assess the evidence as forecast in the documentary materials before the district court in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). This means that the assessment required is substantially similar to, although perhaps even more stringent than, that involved in the assessment of actual evidence on motions for directed verdict. *See Pierce v. Ford Motor Co.*, 190 F.2d at 915.

Where, as here, the nonmoving party would on trial carry the burden of proof, he is therefore entitled, as on motion for directed verdict, to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered. *See generally* 10 Wright & Miller, *Federal Practice and Procedure*: *Civil* § 2713, at 406-10, § 2716, at 431-32; *see also* Louis, *Federal Summary Judgment Doctrine: A Critical Analysis*, 83 Yale L.J. 745, 748-49 n. 19 (1974). Implicit in these basic rules is a consequence, frequently expressed as a maxim, that summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense. *See, e.g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Denny v. Seaboard Lacquer, Inc.*, 487 F.2d 485, 491 (4th Cir. 1973). This reflects a general perception that whether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving. *See, e.g., Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir. 1970) (importance of "demeanor" evidence); *Empire Electronics Co. v. United States*, 311 F.2d 175, 179-80 (2d Cir. 1962) (reliance on circumstantial evidence).

*Charbonnages De France v. Smith*, 597 F.2d at 414 (4th Cir. 1979).

*Charbonnages De France* reflects the rule in Tennessee that denial of summary judgment does not necessarily mean denial of a directed verdict following trial on the merits.

It has sometimes been stated in appellate opinions that if a motion for summary judgment is overruled, a jury question is presented. This is not strictly accurate. The overruling of a motion for summary judgment does not necessarily mean that the case will go to a jury at a trial, because the evidence adduced at trial may be significantly different from that contained in affidavits or depositions heard pre-trial on summary judgment proceedings. All that the overruling of a motion for summary judgment indicates is that the case should proceed further. *See Williamson County Broadcasting Co. v. Williamson County Bd. of Education*, 549 S.W.2d 371 (Tenn. 1977). Whether it will ever go to a jury or whether it will be disposed of on directed verdict pursuant to Rule 50, T.R.C.P., depends upon the record developed at trial.

*Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 388 (Tenn. 1986).

The competing rule is asserted in *Hall v. Tollett*, 128 F.3d 418 (6th Cir. 1997). This rule provides that a mere scintilla of evidence in support of the position of the nonmoving party is insufficient to defeat summary judgment and that there must be evidence produced by the nonmoving party on which the jury could reasonably find in favor of such party. *Hall v. Tollett* in this respect is a recitation of the rule in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (U.S. 1986) wherein it is said:

> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Anderson*, 477 U.S. at 252; *see also*, *Hall v. Tollett*, 128 F. 3d at 422.

Defining the exact parameters of "scintilla" in reported case law is a formidable undertaking. Tennessee does not recognize the "scintilla" rule but rather imposes the "substantial evidence" rule in determining whether or not a case must be submitted to the trier of fact rather than the trier of law. The Supreme Court of Alabama, recognizing the "scintilla" rule, held:

> The rule in this state is that in civil cases a question must go to the jury if the evidence or the reasonable inferences arising therefrom furnish a mere gleam, glimmer, spark, the least particle, the smallest trace, a scintilla, in support of the theory of the complaint. *South Highlands Infirmary v. Camp*, 279 Ala. 1, 180 So.2d 904, 14 A.L.R.3d 1245; *Boggs v. Turner*, 277 Ala. 157, 168 So.2d 1; *Southern Apartments, Inc. v. Emmett*, 269 Ala. 584, 114 So.2d 453; *Alabama Great Southern R. Co. v. Bishop*, 265 Ala. 118, 89 So.2d 738, 64 A.L.R.2d 1190.

*Lankford v. Mong*, 214 So.2d 301, 302 (Ala. 1968).[3]

The substantial evidence rule long applicable in Tennessee as distinguished from the "scintilla" rule is set forth by the Tennessee Supreme Court in *Brenizer v. Nashville C. & St. L. Ry.*:

[3] The "scintilla" rule was statutorily supplanted by the "substantial evidence" rule as of June 11, 1987, by Code of Ala., 1975 section 12-21-12(e) Alabama Code. *See Ricwil, Inc. v. S.L. Pappas & Co., Inc.*, 599 So.2d 1126 (Ala. 1992).

> "There can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issues to be tried."
>
> This is sometimes called the "scintilla rule," but perhaps inaccurately. More than a "scintilla" is requisite. As well said in *L. & N. R. R. Co. v. Johnson*, 161 Ky. 824, 171 S.W. 847:
>
> "The word 'scintilla,' however, as applied in our practice, does not mean that the case should be submitted to the jury when there is merely a 'spark' or a 'glimmer' of evidence."
>
> It means that, when there is some evidence of a material or substantial nature to support the plaintiff's case, the court will not undertake to determine its comparative value or weight, but will leave the determination of the conflict to the jury.

*Brenizer v. Nashville C. & St. L. Ry.*, 3 S.W.2d 1053, 1053-54 (Tenn. 1928) (quoting *Tyrus v. Railroad*, 14 Tenn. 579, 594, 86 S.W. 1074, 1077 (1905)); *see also Sadek v. Nashville Recycling Co.*, 751 S.W.2d 428, 431 (Tenn.Ct.App. 1988); *Ogle v. Winn-Dixie Greenville, Inc.*, 919 S.W.2d 45, 47 (Tenn.Ct.App. 1995).

In applying the "substantial evidence" rule at the summary judgment stage the court is without authority to weigh the evidence. *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn. 1993); *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 200 (Tenn.Ct.App. 1999).

In this context this court has held:

> Defendants cite authority for the proposition that a verdict must be supported by *substantial* evidence and urge that the uncorroborated testimony of plaintiff, standing alone, is not substantial evidence in his favor. Where one witness testifies with positiveness to a fact found, there is material evidence upon which to rest the verdict of the jury. *Standard Loan & Accident Ins. Co. v. Thornton*, 97 Tenn. 1, 40 S.W. 136 (1896).

*Davis v. Wilson*, 522 S.W.2d 872, 878 (Tenn.Ct.App. 1974).

Concerning this generally accepted rule the United States Court of Appeals for the Seventh Circuit observed:

> But it is well established that the initial trier of fact, whether it is an administrative agency, a trial court, or a jury, does not simply stack up quantities of evidence on both sides and see which pile is higher. One compelling witness, or one "smoking gun" document, can overwhelm ten contrary witnesses or a raft of papers, if the trier of fact chooses to believe the one witness and to disbelieve the ten, or it credits the one document and finds the collection wanting.

*American Grain Trimmers v. Office of Workers Comp*, 181 F.3d 810, 817 (7th Cir. 1999).

When everything is considered the rule pronounced by Justice Harbison shortly after Tennessee adopted the Tennessee Rules of Civil Procedure represents a wise and sound statement of the law:

> In concluding this opinion we feel it proper to comment upon the procedure which was followed in the trial of this case. Summary judgment proceedings in this state were authorized for the first time by Rule 56 of the Tennessee Rules of Civil Procedure. This new procedure was designed to fill a vacancy or void which had existed in prior practice and to provide a procedural step which had heretofore not existed. Under previous practice, in both the circuit and chancery courts, there had been no satisfactory intermediate step between the demurrer, which dealt only with the contents of pleadings, and a full-scale trial of a case upon the merits. The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Evco Corporation v. Ross*, 528 S.W.2d 20, 24-25 (Tenn. 1975).

## VI. Inventory Exclusion Law

As an exception to coverage, inventory exclusion clauses have been in general use in the insurance industry for half a century. In a case involving such a clause in a "blanket crime policy" insuring against dishonest acts of employees, the Supreme Judicial Court of Massachusetts observed:

> We were told in argument that § 2(b), the inventory exclusion clause, began to be used in the 1950's and is now in general use throughout the United States. *See* Kurland, Claims for Inventory Shortage Resulting from Employee Dishonesty under Fidelity Insurance Bonds--A Present Appraisal, 33 Ins. Counsel J. 397 (1966). The clause reflected a belief that proof of an inventory shortage does not establish either that there has been actual loss of goods or, in case of an actual loss, that it is due to employee dishonesty. The clause is designed to protect the insurer against claims based on erroneous or falsified computations. *See Dunlop Tire & Rubber Corp. v. Fidelity & Deposit Co.*, 479 F.2d 1243, 1246 (2d Cir. 1973).

*Popeo v. Liberty Mutual Insurance Company*, 343 N.E.2d 417, 419 (Mass. 1976).

A very substantial body of law has developed throughout the country relative to inventory exclusion clauses with much of the case law involving policies insuring against dishonest acts of employees. The clause as it appears in many of these employee dishonesty cases is the same as the clause which appears in *Popeo*:

> "Section 2. This policy does not apply: . . . (b) to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money, securities or other property which the insured can prove, through evidence wholly apart from such computations, is sustained by the insured through any fraudulent or dishonest act or acts committed by any one or more of the employees; . . ."

*Popeo*, 343 N.E.2d at 418, n.1.

While some rules of general applicability can be gleaned from the general body of law as to such inventory exclusion clauses, in the final analysis the decision in this case must be based upon the particular inventory exclusion clause appearing in these "all-risk" policies issued by the defendants. This body of law relative to "all-risk" policies dramatically narrows the field of study because of the limited number of reported cases.[4]

Since many of the general rules relative to such inventory exclusion clauses in a generic sense are at least useful by analogy, we will discuss them first before narrowing our consideration to "all-risk" policy provisions. Among the cases construing the inventory exclusion clause as contained in the *Popeo* case in policies insuring against employee dishonesty are:

1.      *Danal Jewelry Co. v. Fireman's Fund Insurance Co.*, 264 A.2d 320 (R.I. 1970). In this non-jury case the Supreme Court of Rhode Island affirmed the trial court finding that Plaintiff had failed to prove that he had sustained a loss due to employee dishonesty. The court noted a conflict of opinion in reported cases as to whether or not the clause was free from ambiguity noting that the majority rule appeared to be that the clause was indeed unambiguous. Under the majority rule the inventory computations were not admissible in evidence. A minority of decisions have held the clause to be ambiguous and that such inventory computations were admissible as corroborative evidence of an otherwise established loss. The court then held that the Plaintiff's proof failed the test under either rule and affirmed the judgment of the trial court. 264 A.2d at 325.

---

[4] In an extensive annotation entitled "all-risk insurance coverage" section 100 of the annotation discusses "loss or shortage disclosed on taking inventory" with the discussion being limited to *Jones v. Employers Mutual Casualty Co.*, 432 N.W.2d 535 (Neb. 1988); *Blue Stripe, Inc. v. United States Fidelity & Guaranty Co.*, 360 S.E.2d 140 (N.C. 1987); *Betty v. Liverpool & London & Globe Insurance Co.*, 310 F.2d 308 (4th Cir. 1962) and *Miller v. Boston Insurance Co.*, 218 A.2d 275 (Pa. 1966). *See* Vol. 30 ALR 5th 170, 450-452 (1995).

2. *Paramount Paper Products Co. v. Aetna Casualty & Surety Co.*, 157 N.W.2d 763 (Neb. 1968). In this non-jury case the trial court sustained Defendant's motion to dismiss at the close of Plaintiff's evidence. On appeal the Supreme Court of Nebraska affirmed acknowledging that some evidence of loss existed independently of inventory calculations. Said the court, however, "in the present case, Plaintiff had knowledge of only two thefts by employees and the merchandise lost as a result of these thefts was all recovered. Consequently, Plaintiff has failed to prove by either direct or circumstantial evidence any loss whatsoever by reason of employee dishonesty. It has simply shown that such dishonesty had existed, and, by inference, it seeks to attribute its entire loss revealed by an inventory computation to employee dishonesty." 157 N.W.2d at 769.

3. *New York University v. Continental Insurance Co.*, 662 N.E.2d 763 (N.Y. 1995). In this case the trial court had refused to allow Defendant to amend its answer to plead by way of affirmative defense an "inventory shortage" exclusion in the policy. The Court of Appeals of New York held that the trial court had erred in refusing to allow the affirmative defense to be asserted stating "it was error to dismiss the affirmative defense at this early pleading stage of the litigation, because plaintiff had yet to establish that the affirmative defense was meritless as a matter of law." 662 N.E.2d at 772.

4. *Dunlop Tire & Rubber Corp. v. Fidelity & Deposit Company of Maryland*, 479 F.2d 1243 (2nd Cir. 1973). In this non-jury diversity jurisdiction case the trial court dismissed the case on the grounds that Dunlop had failed to prove that the loss was sustained by reason of fraudulent or dishonest acts of Dunlop employees. The court of appeals affirmed finding no independent evidence of loss separate and apart from inventory computations. The court observed: "The standard inventory exclusion clause has been the subject of considerable adjudication. In the typical case, the insured has evidence, other than inventory computations, of the factual existence of a loss due to employee dishonesty. The insured, however, does not have independent evidence indicating the full extent of the claimed loss. The courts are divided as to whether under such circumstances, inventory computations may be introduced to prove the full amount of the loss." 479 F.2d at 1246.

5. *The Gillette Company v. The Travelers Indemnity Co.*, 365 F.2d 7 (7th Cir. 1966). In this non-jury diversity jurisdiction case the trial court entered judgment for the defendant at the conclusion of the plaintiff's proof. On appeal the court of appeals affirmed, with little discussion of the inventory exclusion clause, holding that even conceding the establishment by the plaintiff of a loss he could offer no proof that the loss was due to employee theft or dishonesty.

6. *Teviro Casuals, Inc. v. American Home Assurance*, 439 N.Y.2d 145 (1981). In this case a jury trial resulted in a verdict for the plaintiff in the amount of $15,209. Proof by the plaintiff independent of inventory computations reveals that one employee had been convicted of stealing clothing valued at $20. The appellate court reversed and dismissed holding "even under the line of cases permitting inventory computations to prove the full amount of the loss where there is evidence of a loss due to employee dishonesty, which is apparently the majority view, we doubt that such limited evidence of employee dishonesty is legally sufficient under the exclusion clause to permit the use of an inventory computation to establish (1) that there was a loss of thousands of garments and (2) that the loss was attributable to employee dishonesty." 439 N.Y.2d at 146-147.

7.      *Reedy Industries, Inc. v. Hartford Insurance*, 715 N.E.2d 728 (Ill.Ct.App. 1999).  In this case the trial court granted summary judgment for the defendant on both the "inventory shortage" exclusion and the $10,000 per occurrence deductible clause of the policy.  On appeal the appellate court pretermitted the inventory shortage clause issue and sustained summary judgment on the basis that the plaintiff offered no proof of any one occurrence of loss that exceeded $10,000.

8.      *Ace Wiring & Cable Co. v. Aetna Casualty & Surety Co.*, 457 N.E.2d 761 (N.Y. 1983).  In this case the Supreme Court, Queens County, granted summary judgment to the defendant under the "inventory computation" exclusion clause of the policy.  The appellate division reversed.  The Court of Appeals of New York held that, while "some independent evidence" of loss due to employee theft was required before inventory records could be used in corroboration of the loss, such independent evidence actually existed in the plaintiff's proof, and the grant of summary judgment was improper. The court's description of the exclusionary language is enlightening.

> The standard exclusion contained in section 2(b) has been through a number of formulations.  Originally the standard policy required conclusive proof that an inventory shortage was caused by employee fraud or dishonesty.  After that provision was interpreted to require only proof by a preponderance of the evidence, the standard policy was revised to omit reference to proof from the insuring agreement but to state as section 2 an exclusion in essentially the same language as section 2(b) set forth above, with an added "provided" clause.  The "conclusively establishes" language of former section 3 was dropped and the remainder of former section 3, modified to make clear that it was "subject to the provisions of Section 2(b) of this Policy" and to use the words "reasonably proves" in place of "reasonably establishes," became the present section 4.
>
> The courts split over whether section 2 in that form was ambiguous and over the meaning of "inventory computation".  The "provided" clause of section 2 having played a part in some of the ambiguity holdings, that clause was dropped from section 2 sometime prior to 1976, in an apparent effort to remove the ambiguity.  In our view the policy draftsmen still have not found Ariadne's thread.
>
> The problem is in the words "inventory computation" as used in section 2(b).  Defendant would read that phrase to cover any loss the proof of which requires reference to inventory records.  Such a reading, however, ignores the fact that the word "computation" carries more than one connotation.  Thus, it may mean "the result of computation: amount computed" (Webster's Third New International Dictionary, p. 468).  It may, however, also mean "the act or action of computing: calculation, reckoning" or "a way or system of reckoning" (*Id.*) Or "The act of computing, numbering, reckoning, or estimating" (Black's Law Dictionary [5th ed],, p. 261).  Thus, it involves concepts of both mathematical exactness and of probability or estimation.
>
> To construe it in the first sense would be to make it all but impossible for an insured to recover under the policy for, except in

situations in which an employee is caught in the act with the stolen goods in his possession, it will always be necessary in order to prove the amount of a loss to ascertain the number of units involved through an inventory count. To construe it in that fashion is also inconsistent with section 6 of the policy, which requires the insured to "keep records of all insured property in such manner that the Company can accurately determine therefrom the amount of loss."

The tests to be applied in construing an insurance policy are common speech and the reasonable expectation and purpose of the ordinary businessman. The ambiguities in an insurance policy are, moreover, to be construed against the insurer, particularly when found in an exclusionary clause. We conclude, therefore, that section 2(b) should be read to exclude only losses the proof of which, as to factual existence or amount, turns upon probabilities deduced or estimations made from comparison of posttheft-discovery dollar, as distinct from unit, inventory amounts with a prediscovery dollar amount, or of a post-theft unit number with a pretheft number calculated from a pretheft dollar inventory amount, but not to exclude a loss which can be established by showing that a particular item or unit of goods observed and identified as present at one physical inventory count is not present at the next. (citations omitted).

*Ace Wiring*, 457 N.E.2d at 764.

9.	*United States Smelting Refining & Mining Co. v. Etna Casualty & Surety Co.*, 372 F. Supp. 489 (S.D.N.Y. 1974). In this non-jury case the district court rendered judgment for the defendant holding:

> Section 2(b) of the policies mandates proof wholly independent of inventory computations to support a claim under Insuring Agreement I which covers employee dishonesty. Although plaintiff presented some evidence other than inventory computations to prove employee dishonesty, the Court is not persuaded that plaintiff has made a prima facie case as to the existence of any loss other than through the inventory computations. *Dunlop Tire & Rubber Corp. v. Fidelity & Deposit Co. of Md.*, 479 F.2d 1243, 1247 (2d Cir. 1973); *Kernwood Mfg. Corp. v. Home Indemnity Co.*, 65 Misc.2d 354, 317 N.Y. S.2d 113 (N.Y.Civ.Ct. 1970), aff'd, 67 Misc.2d 888, 326 N.Y.S.2d 682 (App. Term, 1st Dep't 1971). Thus, the Court need not choose between that line of cases requiring independent evidence as to both the existence and amount of loss and the conflicting line of cases allowing the introduction of such computations as only proof as to the extent of loss, where there is some independent proof of employee dishonesty. *See Dunlop, supra*, n. 5 at 1246-1247.

*United States Smelting Refining & Mining Co.,* 372 F. Supp at 494.

10.      *Kentuckiana Sales v. Security Insurance Co. of New Haven*, 394 S.W.2d 744 (Ky. Ct. App. 1965) is a suit on an employee fidelity bond in which the trial court directed a verdict for the insurer. In reversing the directed verdict as to a portion of the claim the Court of Appeals of Kentucky quoted with approval a statement from the appellant's brief providing:

> It certainly does not prohibit the insured from supplementing the proof and corroborating it by the use of such inventory computations or profit and loss computations. On the other hand, if such computations are the only proof and without such proof there is no evidence of either the existence of a loss or its amount, then the clause is effective.

*Kentuckiana Sales*, 394 S.W.2d at 748.

Comparing the outcome of these employee dishonesty cases, at least as to the type of evidence required, with liability under an "all-risk" policy is like comparing apples and oranges. Recovery under an employee dishonesty policy requires proof that the loss was in fact caused by employee dishonesty. Under an "all-risk" policy the reason for the loss is immaterial if it results from any "risks". The body of law developed in these cases, however, deals with an inventory exclusion clause much akin to the clause involved in the policies at bar. Indeed it must be said that the exclusionary clauses in the policies at bar envision the use of inventories to establish the amount of a loss once material evidence independent of inventory sufficient to survive a summary judgment motion is before the court. In this respect the inventory exclusion clause provides "except this exclusion does not prohibit proving the amount of any loss otherwise provable by inventory."

So it appears that the inventory exclusion clauses in the policies at bar are parallel to, and completely compatible with, case law construing the standard inventory exclusion clauses in employee dishonesty policies. In *Fidelity & Deposit Co. of Md. v. Southern Utilities*, 726 F.2d 692 (11th Cir. 1984) the United States District Court for the Middle District of Georgia directed a verdict for the insurer after opening statements had been made relying on the inventory exclusion provision of the policy. In reversing this judgment the court of appeals held:

> The amount of proof necessary to allow use of inventory or profit or loss comparisons was discussed in *Prager & Bear, Inc. v. Federal Insurance Co.*, 66 Cal. App.3d 970, 975-76, 136 Cal. Rptr. 340, 342-43 (1977):
>
> > Prior to 1970, the weight of authority allowed the use of inventory comparisons only for corroboration of independent evidence of employee dishonesty. As a result, coverage was often denied in spite of fairly convincing evidence of employee dishonesty. No evidence of inventory comparisons was allowed to establish the amount of loss even though employees had confessed to dishonesty in

> *Locke Distributing Co. v. Hartford Acc. & Indem. Co.*, (Mo.App. 1966) 407 S.W.2d 658 . . . .
>
> More recent decisions tend to allow an inference of employee dishonesty to be drawn from relatively thin circumstantial evidence and then to permit the full extent of the losses to be proven by inventory comparisons. Generally, these cases have required some proof of dishonesty by employees as a condition precedent to the admission of inventory comparisons to establish the full amount of loss. In some instances, the amount of loss proven to be a result of dishonesty has been only a small fraction of the total loss claimed.

> *See Meyer Jewelry Co. v. General Insurance Co.*, 422 S.W.2d 617, 622-23 (Mo. 1968) (independent proof of employee dishonesty allows use of inventory computation to prove full extent of loss and as corroboration to make a sufficient case for finder of fact where independent proof, considered alone, might be insubstantial).
>
> F & D contends that Southern's case is based entirely on a difference between the estimate on the materials for a job and the actual cost of the materials. If this were true, proof would be barred under the exclusion. Southern relies, however, not just on the difference in estimate and cost but on other circumstantial evidence as well. *Cf. Chenoweth-Chapman Corp.*, 553 S.W.2d at 877 (use of dry cleaning tickets to establish employee dishonesty by showing amount of money that should have been received was not barred by inventory computation exclusion). Briefly, Southern relies on the following evidence independent of any inventory or profit and loss computation: purchase orders, invoices for goods delivered to the wrong site or never delivered, monthly statements, cancelled checks, building plans, job specifications, bid estimates, testimony by independent experts, and testimony about Hayworth's actions that were consistent with dishonesty, such as ordering a wholesale destruction of invoices and clearing out his desk and leaving his job several hours after being told by his superior to explain discrepancies in the construction records. Sufficient independent evidence of dishonesty existed to allow Southern to rely in addition upon inventory computations to prove the full extent of its loss.

*Fidelity & Deposit Co. of Md.*, 726 F.2d 692 at 695 (11th Cir. 1984).

In the only case from Tennessee concerning any "inventory exclusion," this Court observed:

> Defendant asserts that plaintiff's claim is excluded by the policy provisions set out above, because the factual existence of the

loss and the amount of the loss are "dependent upon an inventory computation." The parties have cited no Tennessee authority dealing with this precise policy provision, nor has our research revealed any such authority. However, this provision has been dealt with by courts in other jurisdictions.

*Strings & Things v. State Auto Ins.*, 920 S.W.2d 652, 656 (Tenn.Ct.App. 1995).

The "inventory exclusion" provision in the Strings & Things' policy denied coverage for any loss "or that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation." 920 S.W.2d 652, 653 (Tenn.Ct.App. 1995). The court held that proof that items were received for sale, were not sold by the insured and were missing did not constitute proof of loss by way of inventory computation under the "inventory exclusion" clause of the policy. The court, quoting at length from *Ace Wiring & Cable Co. v. Aetna Casualty & Surety Co.*, 457 N.E.2d 761 (N.Y. 1983), applied that court's construction to deny the insurer the benefit of the exclusion. With this insight into analogous cases we turn to those cases involving the inventory exclusion clause reflected in "all-risk" policies.

A convenient place to begin this discussion is *Mellon v. Federal Insurance Co.*, 14 F.2d 997 (D.C.N.Y. 1926) which involved the perils clause of a marine insurance policy providing:

> Touching the adventures and perils which we, the said assurers, are contented to bear and take upon ourselves, they are of the seas, men of war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, surprisals, takings at sea, arrests, restraints and detainments of all kings, princes and peoples, of what nation, condition and quality soever, barratry of the master and mariners, and of all other perils, losses and misfortunes that have or shall come to the hurt, damage or detriment of the said ship, etc., or any part thereof.
>
> \* \* \*

*Mellon*, 14 F.2d at 1001.

In that case both the port and starboard boilers had exploded. The first, the port boiler, exploded in the course of hydrostatic testing. The second exploded at a later date, after passing the hydrostatic test as required by law. After holding that the port boiler had exploded because of events covered by the "all-risk" clause, the court addressed the starboard boiler.

> In the starboard boiler, the situation is different. The cracks in this boiler I have found not to be attributable to the bursting of the port boiler. I cannot regard them as brought within the terms

"bursting of boilers" in the Inchmaree[5] clause. For some reason, whether from latent defects, wear and tear, or inevitable depreciation I cannot determine, the starboard boiler developed fractures. I cannot say that they were fortuitous, or, if they be regarded as due to latent defects, it has not been proved when such latent defects originated. I only know that they first became evident when the boiler was stripped in May, 1919. It must always be borne in mind that the policies are of *insurance* and not of warranty of soundness, and for that reason no liability arises under the perils clauses for damage to the starboard boiler. The words "other causes of whatsoever nature" cover, in my opinion, "all risks"; but the perils insured against are *risks*.

As Lord Sumner said, in the recent case of *British & Foreign Marine Co. v. Gaunt*, [1921] 2 A. C. at page 57: "The expression does not cover inherent vice or mere wear and tear. * * * It covers a risk, not a certainty; it is something which happens to the subject-matter from without, not the natural behavior of that subject-matter, being what it is, in the circumstances under which it is carried. Nor is it a loss which the assured brings about by his own act, for then he has not merely exposed the goods to the chance of injury; he has injured them himself. Finally the description 'all risks' does not alter the general law; only risks are covered which it is lawful to cover, and the onus of proof remains where it would have been on a policy against ordinary sea perils." *See, also, Schloss Brothers v. Stevens*, [1906] 2 K. B. 665; *Grant Smith & Co. v. Seattle Construction & Dry Dock Co.*, [1920] A. C. 162.

*Mellon*, 14 F.2d 997, 1002-1003 (S.D.N.Y. 1926).

In *Miller v. Boston Insurance Co.*, 218 A.2d 275 (Pa. 1966) the policy provided in pertinent part that Appellee was insured against " 'all risks of loss of or damage . . . arising from any cause whatsoever except: . . (M) unexplained loss, mysterious disappearance or loss or shortage disclosed on taking inventory'." *Miller*, 218 A.2d at 276.

This case involved the loss of a ring owned by Miller and consigned by him to one Jacob Friedman. Friedman in turn consigned the ring to another dealer, David Willner, whose body was subsequently recovered from the East River in New York City. Prior to his death Willner had stated that he had the ring "in his pocket" and was trying to sell it. There is no evidence as to the cause of Willner's death and the ring was not returned to either Friedman or Miller. This case is more helpful in defining the scope of "all-risks" coverage than it is in construing the inventory exclusion clause. After quoting extensively from *Mellon*, the court held:

---

[5] The "Inchmaree" clause resulted from litigation surrounding an accident on the steamship "Inchmaree" appearing in *Thames & Mersey Marine Ins. Co. v. Hamilton Fraser & Co.*, 12 App. Cas. 484. This clause provided insurance of loss or damage to hull or machinery of ships including "bursting of boilers."

Black's Law Dictionary defines the word "Risk" as follows: "In insurance law; the danger or hazard of a loss of the property insured; the casualty contemplated in a contract of insurance; the degree of hazard; a specified contingency or peril; and, colloquially, the specific house, factory, ship, etc., covered by the policy."

George B. Couch, in his excellent "Cyclopedia of Insurance Law", 5 Couch on Insurance, p. 4152, Sec. 1169, says: " 'All risks.' -- An insurance may be in general terms, by a policy covering all risks. Thus, a policy against 'all risks,' the words being inserted in writing, ordinarily covers every loss that may happen, except by the fraudulent acts of the insured." *See also Sun Insurance Office, Ltd., v. Clay, Fla.*, 133 So.2d 735 (1961). Therefore, we must conclude that the very nature of the term "all risks" must be given a broad and comprehensive meaning as to covering any loss other than a wilful or fraudulent act of the insured.

The basic problem before us, then, in this case, is whether appellee has proved the loss of property under the all-risks policy. The applicable rule of law was initially set forth in *Agricultural Insurance Co. v. A. Rothblum, Inc.*, 147 Misc. 865, 265 N.Y.S. 7. It was there held that the sole obligation of the plaintiff was to furnish the defendant with such explanation as it, in good faith, had received and accepted as to the time and cause of the loss. If we were to require the plaintiff to go further and guarantee the accuracy of the explanation of the loss that might have been given to it by the person to whom custody of the goods had been entrusted and who, himself, might be guilty of a fraud unknown to the plaintiff, the inclusive character of the coverage afforded by the insurance policy would be a mere delusion.

*Miller*, 218 A.2d at 277-78.

*Betty v. Liverpool & London & Globe Ins. Co.*, 310 F.2d 308 (4th Cir. 1962) involved an all-risks policy and an apparent loss of 1024 tires from store inventory. The policy terms excluded "unexplained loss or mysterious disappearance of property (except property in the custody of carriers or bailees for hire); or loss or shortage of property disclosed on taking inventory." *Betty*, 310 F.2d at 308-09.

Following a trial on the merits, the trial court sitting without a jury, found for the defendant under the inventory exclusion clause concluding: " * * * that plaintiff could not recover for that all of the evidence indicates that the claimed loss of property was not known prior to and only became known and was disclosed on the taking of the inventory on September 6, 1960." *Betty*, 310 F.2d at 309.

In reversing and remanding for a new trial the court of appeals discussed both the inventory exclusion portion of the excepting clause and the "unexplained loss or mysterious disappearance" portion of the same clause. As to the "inventory exclusion" provisions, the court held:

In order to affirm the judgment below it is necessary to construe the exceptive clause of the policy to mean that no loss is covered if it is first discovered upon taking inventory, no matter what proof may be subsequently brought to light showing the loss to be clearly within the risks for which the policy was written. We feel that such a construction would be unrealistic. It does not seem reasonable to us that business men would enter into an agreement to insure against a loss discovered in one way and not insure against the same loss if it should be discovered in another way. We are, therefore, unable to accept this interpretation of the words under the circumstances of this case.

On the other hand, it would be both reasonable and fair for an insurer to except itself from a loss or shortage reflected solely on the insured's books and not substantiated by any independent external proof--a mere theoretical inventory loss. Such an interpretation is compatible with the other provisions of the exceptive clause which excludes "unexplained loss or mysterious disappearance".

Since the Court erroneously assumed that the plaintiff could not recover if its loss was first discovered by taking inventory, we cannot determine what weight should be given to its further findings of fact concerning the nature of the loss, i.e., whether it was of undetermined or mysterious nature.

Especially is this true in view of the Court's treatment of the evidence other than that dealing with the insured's books, records, and inventories. The testimony of Love was not offered to show that the insured had lost the seven tires which Love was convicted of stealing, for obviously these tires had been returned to the insured by the police. Love's testimony was to the effect that he had observed a truck loaded with tires driving away from the rear of the insured's lot at night and that he had upon investigation found the seven tires which he was charged with stealing lying on the ground outside the fence surrounding the insured's property. Whether we believe this improbable tale in full, in part, or reject it altogether, the fact that Love was caught and convicted of possessing the insured's tires would tend to show that the property was being stolen from insured's place of business and it was against this risk among others that defendants had insured. Further, the Court rejected the plaintiff's offer of testimony of a series of thefts which occurred prior to the period in question. It appears that the Court rejected the evidence on the grounds that it was offered in the form of a compromise between the parties as to the meaning of the exceptive clause of the policy. But, this evidence, especially in conjunction with the Love testimony, might have been admissible as tending to support plaintiff's contentions that his property was being stolen. It is a question of relevancy which must be determined by the Trial Court.

The plain provisions of the policy insured against all risks of direct physical loss. Once having shown a loss, the plaintiff should not be required to go forward and prove its loss was not within any one of the numerous exceptions listed in the policy. To escape the broad undertaking of this comprehensive cover it would be the insurer's burden to establish such facts. *Jewelers Mutual Insurance Co. v. Balogh*, 272 F.2d 889, and cases cited at 892 (5 Cir., 1959). The exclusion clause here dealt with was originally developed for use in theft policies to protect the insurer against fraud on the part of insureds, especially fraud growing out of so-called "inside jobs". *United Sponging Co. v. Preferred Accident Insurance Co.*, 97 Misc. 396, 161 N.Y.S. 309 (1916); affirmed without opinion in 179 App. Div. 884, 165 N.Y.S. 1116 (1917).

*Betty*, 310 F.2d at 310-11.

In *Chadwick v. Aetna Insurance Co.*, the North Carolina Court of Appeals, with limited analysis, held that the trial court erred in instructing the jury that they were not to be concerned with whether a loss was unexplained or mysterious unless it was disclosed on taking inventory. Further, the court held that the "import of the provision is to bar recovery for unexplained losses or for mysterious disappearances, however they come to light, and for loss or shortage disclosed on taking inventory." *Chadwick*, 176 S.E.2d 352, 353 (N.C. Ct. App. 1970).

In *Blue Stripe, Inc. v. United States Fidelity & Guaranty Co.*, 360 S.E.2d 140 (N.C. Ct. App. 1987), this same exclusion language was in issue in a case where a March 1983 inventory by the store manager indicated a substantial amount of computer inventory was missing. The store then conducted a detailed inventory and submitted its claim to U.S.F.&G. in November 1983. The insurer denied the claim and after trial on the merits the trial court granted a directed verdict which the court of appeals affirmed relying on *Chadwick*. Concluding its opinion, the court of appeals stated: "We are compelled by *Chadwick* to honor the exclusion without qualification or exception. Blue Stripe points to extensive authority from other jurisdictions limiting the impact of exclusions in 'all- risks' policies; however, in view of *Chadwick*, it is beyond this court's power to adopt such reasoning, notwithstanding its persuasiveness." *Blue Stripe, Inc.*, 360 S.E.2d at 141.

*Jones v. Employers Mutual Casualty Co.*, 432 N.W.2d 535 (Neb. 1988) involved losses of gasoline at certain service stations. The "all-risks" policy at issue contained the "disclosed on taking inventory" language:

The policy of insurance applicable in this case contains as endorsements forms MP 00 13 and MP 00 14, both of which apply to Cornhusker Highway, but only MP 00 13 relates to St. Paul and Gothenburg. MP 00 13 states in part: "This policy does not insure under this form against: . . . 6. unexplained or mysterious disappearance of any property, or shortage disclosed on taking inventory . . . ." MP 00 14 is almost identical, but it eliminates the word "any" before property and adds "of property" after shortage.

-23-

*Jones*, 432 N.W.2d at 538-539.

Despite proof of theft of several thousand gallons of gasoline the supreme court held that the loss was in fact established only by inventory and barred any recovery under the inventory exclusion clause. This case is of limited value in our analysis because every case relied upon by the Supreme Court of Nebraska dealt with employee dishonesty and policies wherein coverage was limited to employee dishonesty rather than all-risks coverage.[6]

*Empire Steel Trading Co., Inc. v. New York Marine Managers, Inc.*, 1989 WL 105846 (S.D.N.Y. 1989) is a case more important for its discussion of the "mysterious disappearance-unexplained loss"[7] exclusion than it is for the "shortage disclosed on taking inventory" exclusion.

The clearest guidance for decision in this case is provided by the *en banc* opinions of the Court of Appeals of Texas in *Betco Scaffolds Co., Inc. v. Houston United Casualty Ins. Co.*, 29 S.W.3d 341 (Tex.Ct.App. 2000). The *en banc* panel consisted of ten judges with the six member majority opinion being written by Justice Edelman and the four-member dissenting opinion being written by Chief Justice Murphy. *Betco* is a hard case on its facts since the proof indicates two small burglaries occurring on June 13 and July 3 respectively of 1995. These burglaries were promptly reported to the police but no claim was made under the insurance policy because the combined value of the stolen inventory in the two thefts did not exceed the $25,000 deductible for theft under the policy. Police reports were filed after each of these two burglaries listing the values of particular properties stolen. The combined total of losses in the two burglaries was $11,000. On September 30, 1995, Betco took its annual fiscal inventory indicating a shortage of over $158,000. Betco, without the benefit of any additional evidence, was seeking to have the trier of fact infer from the June and July 1995 burglaries that the inventory shortage of $158,000 was attributable to those burglaries. The relevant provisions of the insurance policy provided: "3. This policy insures against all risks of direct physical loss of or damage to the insured property from any external cause, except as hereinafter excluded. 4. This policy does not insure against: * * * (b) Loss or shortage disclosed upon taking inventory; . . . " *Betco*, 29 S.W.3d at 345.

The trial court granted summary judgment to the insurer. This case is limited specifically to the "inventory exclusion" exception in the policy as the Houston United Policy contains no "unexplained loss" or "mysterious disappearance" exclusion. On appeal the majority of the court of appeals held the language of the policy to be unambiguous, declined to follow *Betty v. Liverpool & London & Globe Ins. Co.*, 310 F.2d 308 (4th Cir. 1962), and affirmed the grant of summary

---

[6] The cases relied on are *Paramount Paper Products Co., Inc. v. Aetna Casualty & Surety Co.*, 157 N.W.2d 763 (Neb. 1968); *Prager & Bear, Inc. v. Federal Insurance Co.*, 66 Cal.App.3d 1970 136 Cal.Rptr. 340 (1977); *Gillette Co. v. Travelers Indemnity Co.*, 365 F.2d 7 (7th Cir. 1966); *Danal Jewelry Co. v. Firemans Fund Ins.*, 264 A.2d 320 (R.I. 1970); *Ft. Smith Tobacco & Candy Co. v. American Guaranty & Life Ins. Co.*, 208 F.Supp. 244 (W.D.Ark. 1962); *Locke Distributing Co. v. Hartford Accident & Indemnity Co.*, 407 S.W.2d 658 (Mo.App. 1966).

[7] The tension existing between the insuring clause in an "all-risk" policy and the "unexplained loss or mysterious disappearance" exclusion has not gone unnoticed. *See Betty v. Liverpool & London & Globe Insur. Co.*, 310 F.2d 308, 311 (4th Cir. 1962). At some point in these proceedings the parties and the courts will be required to reconcile the "mysterious disappearance-unexplained loss" clause (carried over into "all-risk" policies from its origin in "named peril" policies), with the broad coverage insuring language of "all risk" policies.

judgment. The majority opinion observed at the outset: "The parties have cited and we have found no Texas court opinion interpreting the effect of a similar provision. Even decisions from other jurisdictions have rarely specifically construed 'disclosed on taking inventory' language." *Betco*, 29 S.W.3d at 344.

The court observed that the only evidence independent of the regularly scheduled inventory were the two separate burglaries totaling less than the $25,000 deductible under the policy, and that these burglaries had been investigated and closed without claim against the insurance company. Said the majority:

> Although Betco seeks to attribute the September shortage to the two burglaries, it presented no evidence to support any such inference. On the contrary, Betco's loss prevention manager admitted that he did not have even the capability to determine whether any of the items discovered missing in the September inventory could have been taken in the burglaries. In theory, some or all of the September shortage could have instead resulted from a variety of other causes, as outlined above, which: (a) could have occurred before and/or after the burglaries; (b) might or might not have involved an actual physical loss from an identifiable external cause; and (c) would be difficult or impossible to ever identify with reasonable certainty.
> As illustrated by the circumstances of this case, and contrary to the rationale of *Betty*, we believe that the inventory exclusion provision reflects a recognition of the inherent uncertainty as to the causes of shortages which are only disclosed upon taking a periodic physical inventory. We further believe that the inventory exclusion provision (like a proof of loss provision) reflects a recognition that an insurer should be afforded a fair opportunity to: (i) investigate the circumstances of a claim before circumstances change and memories fade, and (ii) where, as here, a theft is alleged, attempt recovery of the stolen items. The fact that an insurer can be held liable for failing to reasonably investigate a claim, as Betco has alleged, further underscores the need to allow an insurer's investigation to be made while the greatest likelihood exists to collect meaningful information. The passage of time and occurrence of intervening events can only operate to obscure relevant facts and defeat these objectives.

(footnotes omitted.)

\* \* \*

> The summary judgment evidence in this case established that Betco had completed its investigation of the two burglaries, unequivocally reported the amount stolen to police, and decided without qualification that the magnitude of the losses did not exceed the deductible and thus warrant filing an insurance claim. There is no

evidence that Betco was continuing to investigate the loss, held any doubt as to the accuracy of its initial estimates of the losses, or was expecting to use the September 30 inventory in any way to measure the losses from the burglaries. It was only when a considerable inventory shortage was disclosed by its annual physical inventory that Betco sought to attribute any greater loss to the burglaries. This is precisely the type of situation which we believe the inventory exclusion provisions was intended to avoid. The summary judgment evidence thus established that Betco's September shortage was disclosed upon taking inventory.

*Betco*, 29 S.W.3d at 346-47.

So it is that the majority of the *en banc* Court of Appeals of Texas rejected the rationale of *Betty*, held that the language of the "inventory exclusion" exception was unambiguous and, that Plaintiff had offered no evidence independent of a regular inventory calculation to support its claim.

The dissenting opinion asserted that the word "inventory" in and of itself created ambiguity inasmuch as both parties discussed several types of inventories ranging from paper inventories to actual physical inventories. The dissenters accepted the analysis in *Betty* and held that Betco had provided sufficient evidence independent of the scheduled inventory to survive summary judgment. The dissenters then find:

> Finally, though the majority relies on the rationale of the inventory exclusion provision in denying Betco's interpretation, its interpretation fits squarely within that rationale. Houston United urges that the rationale for the inventory exclusion is to insure that an insurance company will not have to indemnify erroneous or falsified inventory, shoplifting, employee dishonesty, inaccurate accounting or losses that are not provable by independent external evidence. This is in keeping with the intent of the policy as expressed in other decisions. *See Dunlop Tire*, 479 F.2d 1243, 1246 (stating the inventory exclusion clause "was designed to protect insurers from claims based on erroneous or falsified inventory or profit and loss computations") (citing *Paramount Paper Prods. Co. v. Aetna Cas. & Surety Co.*, 182 Neb. 828, 157 N.W.2d 763 (1968)). Here, Betco's loss is not merely a loss reflected on paper incapable of being traced to an external source or event. Rather, Betco's loss is traceable to the June 13th and July 3rd burglaries through, at the least, circumstantial evidence. Moreover, the majority's concern that finding the inventory exclusion inapplicable to this case would hamper investigatory efforts by the insurer is misplaced. Such a concern is covered elsewhere in the insurance contract which requires losses to be reported to the insurer within ninety days of the loss, thus providing another ground for an insurer to deny a claim. While the majority may be correct in finding Houston United's interpretation

the most reasonable, this does not foreclose the court from finding Betco's interpretation reasonable, as well.[8]

Because we believe that the interpretation of the inventory exclusion clause offered by Betco is reasonable, we would reverse the judgment of the trial court and remand the case for the resolution of fact issues so that a determination can be made that the losses disclosed by Betco's inventory are indeed linked to the thefts. We are also concerned with the impact of the majority's decision on coverage under "all risk" policies such as the one issued by Houston United to Betco. As the summary judgment proof shows, Houston United denied Betco's claim under the inventory exclusion simply because Betco's inventory revealed the size of the loss. Under the majority's view, any loss disclosed by an inventory, whether or not the loss was due to an event covered under the policy, would not be covered under the policy. The moral of the story told by the majority is that an undetected thief is an insurer's best friend. Since we do not believe this is what was intended under Houston United's policy, we do not join in the majority's decision.

*Betco*, 29 S.W.3d at 352-53.

So it is that the majority and the dissenters in *Betco* disagree as to whether or not ambiguity exists in the language of the exclusion with the majority rejecting the *Betty'* analysis because it finds no ambiguity to exist in the exclusion language, while the dissenters accept the *Betty'* analysis on the basis that the language is ambiguous. The decisive point as it relates to the case at bar, however, is gleaned from both the majority opinion and the dissenting opinion. The majority says:

Based on what we perceive to be the overall intent of the policy and the plain meaning and rationale of the inventory exclusion clause, we conclude that this provision expressly allocates to the insured the risk of a loss or shortage which comes to the attention of the insured solely by reason of taking a regularly scheduled, i.e., periodic, physical inventory. We recognize that a regularly scheduled inventory could coincide with the investigation of a casualty in such a way that the inventory is *intended* by the insured as a means to quantify the loss. In that event, the inventory exclusion provision

---

[8] When making this last observation the dissenters relied on Texas law stating "when an insurance policy is ambiguous, the court construing the policy must adopt the interpretation most favorable to the insured." *See State Farm Fire & Casualty Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tx. 1998).

would not exclude the loss because the loss would not have been disclosed upon taking inventory.[9]

*Betco*, 29 S.W.3d at 347.

On this same subject the dissenters observe:

> Even assuming the majority's view is correct and the clause is not ambiguous, a fact issue exists about whether the loss was "disclosed upon taking inventory" or, rather, was quantified by it. This fact issue, under any view, makes the grant of summary judgment inappropriate.
>
> The majority makes much of the fact that many more explanations for the loss exist. While we agree, such alternative explanations have no place when analyzing facts in a motion for summary judgment. We must view the evidence in the light most favorable to the nonmovant and indulge every inference in its favor.
>
> Based on the facts of this case, the phrase "disclosed upon taking inventory" becomes ambiguous because the loss was known before the inventory was taken. Rather, what was disclosed by the inventory was the size of the loss.

*Betco*, 29 S.W.3d at 350.

*Betco* deals alone with the "inventory exclusion" clause of an all-risk policy and not with the "unexplained loss or mysterious disappearance" exclusion in such a policy. If one takes the majority opinion in *Betco* as an ex-cathedra pronouncement, then in many respects an "all-risk" policy is converted into a "no-risk" policy. Said the majority: "Based on what we perceive to be the overall intent of the policy and the plain meaning and rationale of the inventory exclusion clause, we conclude that this provision expressly allocates to the insured the risk of a loss or shortage which comes to the attention of the insured solely by reason of taking a regularly scheduled, i.e., periodic, fiscal inventory." *Betco*, 29 S.W.3d at 347.

In this holding the *Betco* majority rejects *Betty v. Liverpool & London & Globe Ins. Co.*, 310 F.2d 308 (4th Cir. 1962) in its reasoning. *Betty* held:

> In order to affirm the judgment below it is necessary to construe the exceptive clause of the policy to mean that no loss is covered if it is first discovered upon taking inventory, no matter what proof may be subsequently brought to light showing the loss to be clearly within the risk for which the policy was written. We feel that such a construction would be unrealistic.

---

[9] It bears noting that according to Plaintiff's proof in the case before us, the September 1998 inventory was not a regularly scheduled inventory, but was conducted because of HCA's suspicion of losses during the FDR contract. Also FDR's assignee, Tartan, wanted the inventory at the outset of its responsibilities under the assignment.

*Betty*, 310 F.2d at 310.

Taking the opinion of the majority in *Betco* to its logical conclusion under an all-risk policy, if a thief steals a fortune in merchandise from the insured and then the insured takes a regularly scheduled inventory and, for the first time, discovers a shortage after which he embarks upon a fruitful investigation of events prior to the inventory and discovers both the theft and his loss resulting from theft, he is barred from recovering his loss because of the "inventory exclusion" clause in the policy. So it is that the dissenters in *Betco* observed: "The moral of the story told by the majority is that an undetected thief is an insurer's best friend." *Betco*, 29 S.W.3d at 353.

The better rule is reflected in *Betty v. Liverpool & London & Globe Ins. Co.*, 310 F.2d 308 (4th Cir. 1962) that limits the "inventory exclusion" clause in an all-risk policy to cases in which a plaintiff seeks to establish a "loss" by comparing inventory calculations and then equating an inventory shortage to a "loss" covered by the policy without any evidence of loss other than such inventory calculations. As observed in *Betty*: "It would be both reasonable and fair for an insurer to except itself from a loss or shortage reflected solely on the insured's books and not substantiated by any independent external proof - - a mere theoretical inventory loss." 310 F.2d 308, 310 (4th Cir. 1962).

Under the rationale of *Betty*, the vast majority of cases from other jurisdictions and, indeed, the unanimous observations in *Betco*, coupled with the very language of the inventory exclusion clauses of the policies in issue, the decision on this summary judgment appeal rests upon a determination by this court of whether or not the evidence offered by the plaintiff, independent of inventory, constitutes "more than a scintilla" of evidence establishing a loss resulting from a risk. If the plaintiff's proof as offered meets the burden, summary judgment must be reversed. If, to the contrary, the proof does not constitute "more than a scintilla" of evidence establishing the loss, summary judgment must be affirmed.

## VII. Proof Offered by Plaintiff

### A. Frederick Keller's testimony and contemporaneous documents

The plaintiff's evidence is in large part supplied by Frederick Keller, Jr., who, in March of 1997, was given responsibility by HCA to manage the FDR contract. Since the case for HCA, at least at the summary judgment stage, must stand or fall upon the testimony of Mr. Keller, we will review the pertinent parts of that testimony in detail.

Mr. Keller's suspicion about FDR management of linens was aroused in March of 1997. He testifies:

> Q.     Well, when did you become involved in evaluating the FDR contract, or their services, to determine whether they were causing you losses beyond acceptable losses?
> A.     Well, certainly as my - - my responsibility for assisting in that evaluation, and certainly the responsibility of managing the

FDR agreement from an operational perspective didn't start until March of '97.

Q. Okay. At the time did you - - were you aware of any losses beyond what you would term acceptable losses from the FDR servicing arrangement?

A. In March of the '97?

Q. Yes.

A. The problems that we - - when I came into the position, the problems that not only - - and obviously they may have been a little varied. But there were consistent problems that as we - - or as my tenure developed, if you will, yes, we were suspicious that losses to our inventory had or were occurring.

Q. Well, losses to linen inventory occur constantly in every hospital in the United States, do they not, sir?

A. Losses are a typical part of using linen, but so is appropriate management of replacement such that you maintain your inventory. Both are part of a linen utilization program, or, as you referenced, using linen in a typical hospital or acute care facility.

Q. And are linen management programs put in place in an attempt to keep losses from using linen to an acceptable level?

A. They should be.

Q. That's your goal, right?

A. Correct.

Q. And if they're effective, they come close to the goal, or reach it; if they're ineffective, they don't reach the goal, right?

A. You would think, yes.

Q. And, in fact, with FDR, one of the conclusions you reached at the end of some time period of study, and research and evaluation, was that FDR's management function of the linen program was not effective and caused unacceptable losses; is that correct?

A. Yes.

Q. At what time did you learn that FDR's management of the linen processing caused unacceptable losses?

A. I can't recall a specific date, if that's what you're asking, as to when we discovered that. Obviously from the information we had, and as I developed into my position, by third and fourth quarter of 1997 it was very evident, and we had strong suspicions that due to the gross mismanagement, or some other means on FDR's part, that there was a loss to our inventory. And certainly by March - - I would say March of 1998, after we made numerous efforts to again increase our awareness and put other measurement tools in place to monitor, it was clear that we had a loss to our inventory.

Q. And is that the best estimation you can give as to when you first had strong suspicions and then had a clear understanding of losses to the Columbia/HCA inventory?

A. Well, again, you know, there's no specific date, but in hindsight the issues that we consistently faced from March until - - you know, let's say through the third and fourth quarter of 1997 were really no different or no more inconsistent than issues that I faced prior to that, and that could have been in place as well previously, or prior to me coming into the position.

Q. You just don't know?

A. I don't know.

Q. Okay. So what you're saying is in the third and fourth quarter of '97 you had strong suspicions that FDR was mismanaging the entire program?

A. Yes.

In further testimony, Mr. Keller stated:

A. Well, to that point I would have said the same. Really, to reiterate, the cause of the loss was FDR's mismanagement. There are specific instances that are identified and evidence various documents that it could have been theft, could have been they didn't know what they were doing, could have been they diverted inventory to other facilities, could have been they operated off of inaccurate information; one cause - - the position we have is the cause is specifically related to their inability to manage our inventory.

In about October of 1997, HCA set up an FDR review team to study the problems and make recommendations. Mr. Keller testified:

Q. That's question - - I'd like to ask you about the FDR review team investigation, its results and recommendations. Can you tell me, please, what was your role, sir, in that; what is the FDR review team and what it did?

A. The FDR review team, really, was a representative group of individuals that comprised, really, an ad hoc committee based on a number of the service issues that they and their facilities were experiencing to try and determine what the problems were, were they chronic problems, meaning isolated to one facility or region or across multiple areas; look at replacement spend and the cost of the program; and, based on that assessment, were there any recommendations to make the service better.

At this summary judgment stage of the case we can "weigh" the evidence only for the purpose of determining if the evidence offered by the plaintiff is "more than a scintilla" of evidence in support of the non-moving party. *See*, *e.g.*, *Brenizer v. Nashville C. & St. L. Ry.*, 3 S.W.2d 1053,

-31-

1054 (Tenn. 1928). In this context the after-the-fact testimony of Mr. Keller as to the pre-September 1998 inventory events is buttressed by documents written contemporaneously with the event.

On November 13, 1997, Mr. Keller wrote an interoffice memorandum to Jay Seyss, a management officer of HCA:

> I wanted to briefly update you on something I had one of our facilities do for us and the FDR Review Team. Several weeks ago I had JFK in Florida set up their scales to weight (sic) all linen into and out of their facility so we could use this data to compare to what FDR documented. Upon weighing all linen in and out, we even had the FDR driver sign each weight slip to verify the weight being taken at the hospital.
>
> We did a one week study at the end of October and the results were mind boggling to say the least. Clean pounds delivered showed a discrepancy of over 900 pounds within the first two days! JFK was only delivered 10,000 pounds in these two days and FDR says they delivered them nearly 11,000 pounds. The FDR delivery tickets do not even come close to what JFK weighed in and FDR's driver verified.
>
> The soiled return counts were even a greater mystery. Within the first two days of returning linen, FDR, after their driver verified carts and weights, turned around and claimed the facility did not even return all the carts. As a matter of fact, FDR could not account for 4 carts that their own driver verified left the hospital. Secondly, their total soiled pounds counted nearly 3,500 pounds short for the entire week. This is based on actual weights, verified by FDR.
>
> When JFK brought this to the attention of Mike Pucci, FDR's most recent district manager, he was helpful in pinning down the problems and admitted that this was not correct. He took the information and was going to go back to FDR and look further into the problem and correct the issue for JFK. It might be coincidence, but I heard today that Mike Pucci had been released from employment with FDR.
>
> I don't mean to make this email lengthy, but this is extremely suspicious that numbers could be this far off. These kinds of discrepancies add up to hundreds of thousands, even millions of dollars annually. I would like to discuss further with you when we get a chance.

On March 2, 1998 Alex Mendes, chief operating officer at Columbia Kendall Medical Center of Miami, Florida, [Kendall] sent by certified mail a letter with a copy to Mr. Keller to Richard C. Luneberg, CEO/chairman of FDR Services Corporation in Hempstead, New York, stating:

We have recently reorganized our system that manages the linen ordering, receiving, and distribution process. As a part of that reorganization we have noticed discrepancies that we would like you to be aware of and address. Attached is a worksheet which details the daily discrepancies for a seven-day period. A discrepancy in this context is defined as a difference from what the bin tags show you are delivering to what is actually delivered (not the difference from what our order is).

In short, for the seven day period monitored, we received 1,044 items less than FDR shows were delivered on the bin tags, which amounted to approximately 1,225 pounds. The concern is not the seven days we have identified and reported to FDR, the concern is the other discrepancies not detected due to the fact that we relied on your bin tags to identify the quantity of linen arriving. These consistent discrepancies have caused us to lose faith in FDR and have raised a question as to how long these discrepancies have been occurring, and how much we have may (sic) overpaid to FDR in pipeline charges due to our reliance on FDR reports.

There are several implications from the discrepancies described above. If we are charged by the piece for incoming linen and don't actually receive it, we have been overcharged. In addition, if the bin tags claim that a certain number of pounds (e.g., 100 lbs) were delivered, however, we received something less than that (e.g., 90 lbs) there will be a "soiled variance" of approximately eleven pounds.

| | |
|---|---|
| Delivery per bin tags | 100 lbs |
| Actual delivery per physical count | 90 lbs |
| Shortage | 10 lbs |
| Soil Percentage | 10 % |
| Total Soiled Variance on Outgoing | 11 lbs |

As per the attached linen analysis for the seven days under review, the soiled variance would be the 1,225 pounds of linen shortage plus the 10% soil factor that you apply to the invoices which would yield a soiled variance of approximately 1,348 pounds. This then would be billed back to the facility through "pipeline" charges for not returning the linen that was supposedly supplied to Kendall. Therefore, as I see it, we have been overcharged for the linen received (because consistently we have been receiving less linen than is reported by FDR on the bin tags) and also being charged for not returning linen that we have never received.

These contemporaneous memoranda are by no means self-explaining as to exactly what problems HCA was facing. The one week study at JFK in Florida referred to as "mind boggling"

is consistent with a scheme to overstate deliveries and understate soiled returns to support overcharging for linen. It is also consistent with the possibility that FDR in the first two days of October 1997 may have converted over 900 pounds of linen to other uses. The March 2, 1998 Alex Mendes memo is likewise consistent with either scenario one of which would involve an "on paper" deception and the other of which would involve conversion of inventory which might qualify as a loss under the policy. It is not necessary for the plaintiff in meeting a summary judgment motion to develop its case beyond the one week study at JFK and beyond the seven day period at Kendall Medical Center. Although these contemporaneous memoranda are susceptible of more than one interpretation, and indeed may be determined by the trier of fact to be meaningless, the trier of law on summary judgment motion must construe them in the manner most favorable to the non-moving party. *See Byrd v. Hall*, 897 S.W.2d 208, 210 (Tenn. 1993); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Thus, we are not concerned at this point with the effect of the pre-September 1998 events on the issue of timeliness of the notice of loss to the insurers, nor of any effect of such evidence on the single or multiple "occurrence" issue regarding the $250,000 deductible under the policies.

## B. The "cancellation rule"

The record shows that Frederick Keller gave an extensive statement under oath on October 4, 2000, pursuant to the terms of the policies. He further gave a deposition on April 2, 2002 and another deposition on August 28 and 29, 2002. Careful review of his testimony in each instance reveals discrepancies, apparent contradictions and statements that are subject to varying interpretations. Ample material for cross-examination and testing of his credibility appears from these differing statements. In order for his statements to become meaningless within the meaning of the "cancellation" rule of *Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 483 (Tenn.Ct.App. 1978), the contradiction must be unexplained and the proffered version uncorroborated. The rule provides:

> It is a rule of law in this state that contradictory statements of a witness in connection with the same fact have the result of "cancelling each other out." *DeGrafenreid v. Nash. Ry. & Lt. Co.*, 162 Tenn. 558, 39 S.W.2d 274 (1931); *Johnson v. Cincinnati N. O. & T. P. Ry. Co.*, 146 Tenn. 135, 240 S.W. 429 (1922); *Donaho v. Large*, 25 Tenn. App. 433, 158 S.W.2d 447 (1941); *Southern Motors, Inc. v. Morton*, 25 Tenn. App. 204, 154 S.W.2d 801 (1941); *Nashville & American Trust Co. v. Aetna Cas. & Sur. Co.*, 21 Tenn. App. 366, 110 S.W.2d 1041 (1937).
>
> > The question here is not one of the credibility of a witness or of the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies; but if the proof of a fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his

> testimony to disprove it, and it would be mere caprice in a
> jury upon such evidence to decide it either way.
>> *Johnson, supra*, 146 Tenn. at 158, 240 S.W. at 436.

*Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482, 483 (Tenn.Ct.App. 1978).

Contradictory statements of Keller do not appear from the entirety of his testimony to be unexplained as a matter of law. The version of his testimony proffered by the plaintiff does not appear to be uncorroborated as a matter of law. The rule of cancellation is thus not applicable.

The evidence of possible linen losses several months prior to the September 1998 inventory is not limited to Mr. Keller alone, but was evident to other individuals within the HCA system. This synopsis of portions of the testimony of Mr. Keller together with supporting documentation is directed to the question of whether or not evidence exists in the record separate and apart from the September 1998 inventory that "disclosed" a loss within the meaning of the policy. This evidence is taken in the light most favorable to the non-moving party and all other evidence in the record is disregarded. Possible or probable contradictions in the testimony of Mr. Keller are likewise disregarded in determining the summary judgment issue before the court. *Taylor*, 573 S.W.2d at 480; *see also*, *Lucas Brothers v. Cudahy Co.*, 533 S.W.2d 313, 315 (Tenn. Ct. App. 1975).

At summary judgment stage of these proceedings we are not concerned with whether or not the plaintiff can ever prove its case. "The plaintiff is not required to prove his entire case by a preponderance of the evidence at the summary judgment stage. He need only raise genuine issues of material fact, making summary judgment inappropriate. Nothing more is required of the plaintiff as the non-moving party." *Byrd v. Hall*, 847 S.W.2d 208, 217 (Tenn. 1993).

Whether or not the trier of fact will accept the plaintiff's evidence establishing a loss independent of the inventory, or, indeed, whether or not the September 1998 inventory quantifies any such loss, remains to be seen. Such considerations are for the trier of fact and not the trier of law.

## VIII.  Conclusions of Law

The record before us leads to several inescapable and interdependent legal conclusions. (1) The evidence in the record offered by the non-moving Plaintiff reflects more than a "scintilla" of evidence of loss within the meaning of the policies independent of the September 1998 inventory. (2) Whether the "inventory exclusion" clause can bar recovery by the Plaintiff as a matter of fact must await trial on the merits. (3) The "inventory exclusion" clauses of the policies are not applicable as a matter of law at summary judgment stage in order to bar Plaintiff from proceeding further. (4) Whether the "inventory exclusion" clause will apply as a matter of law upon motion for a directed verdict at the conclusion of trial on the merits must await such trial. (5) Summary judgment granted by the trial court on the only issue that is before this Court on appeal, to-wit, the applicability of the "inventory exclusion" clause as a matter of law must be reversed and the case remanded for further proceedings.

## IX. Disposition of the Case

The heart and soul of this controversy concerns an "all-risk" policy of insurance and not a specified-risk policy. As the trial court observed:

> The effect of an all-risk policy is to broaden coverage. A policy of insurance insuring against all-risks creates a special type of insurance 'extending to risks not usually contemplated, and recovery under the policy will generally be allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured unless the policies contain a specific provision expressly excluding the loss from coverage.' . . . It is not necessary for the plaintiff to show how the property came to be lost or the methods or means by which the property came to be lost. It is sufficient if the plaintiff shows the property is lost and covered by the physical loss provision of the policy of insurance. (citations omitted)

The insurance against "all-risks" does not convert the policy into a warranty. *Mellon v. Federal Ins. Co.*, 14 F.2d 997, 1002 (S.D.N.Y. 1926). Nonetheless, since the trial court in its final judgment, overruled the motions for summary judgment of the Appellee/Defendants as to all grounds except the "inventory exclusion" clause, it follows that upon reversal by this Court of the grant of summary judgment under the "inventory exclusion" clause the case will be before the trial court on all issues drawn by the pleadings. Since overruling a motion for summary judgment does not necessarily preclude granting a directed verdict at the conclusion of trial on the merits, *Hamrick v. Spring City Motor Co.*, 708 S.W.2d 383, 388 (Tenn. 1986), such a possibility as to the application of the "inventory exclusion" clause remains viable upon remand. Defendants' affirmative defenses including their affirmative defenses of "loss or shortage disclosed on taking inventory," or "unexplained loss or mysterious disappearance," or "losses caused by normal wear and tear," together with the 12th, 13th and 14th defenses relying on the $250,000 deductible in the policy remain viable on remand.

The judgment of the trial court is reversed and the case is remanded for further proceedings under the issues drawn by the pleadings. Costs of appeal are assessed against Appellees.

_____
WILLIAM B. CAIN, JUDGE